**FEDERAL ELECTION COMMISSION,**
Appellee,

v.

**NATIONAL RIFLE ASSOCIATION OF AMERICA, et al., Appellants.**

No. 00–5163.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 2, 2001.

Decided June 29, 2001.

Rehearing En Banc Denied
Aug. 23, 2001.

---

Richard E. Gardiner argued the cause and filed the briefs for appellants. Christopher A. Conte and Michael W. Lojek entered appearances.

Richard B. Bader, Associate General Counsel, Federal Election Commission, argued the cause for appellee. With him on the brief were Lawrence M. Noble, General Counsel, and Vivien Clair, Attorney.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Concurring opinion filed by Circuit Judge GINSBURG.

TATEL, Circuit Judge:

During the 1978, 1980, and 1982 federal election cycles, the National Rifle Association spent $37,833 on behalf of its political action committee. In a civil enforcement action brought by the Federal Election Commission, the district court found that the NRA violated the Federal Election Campaign Act of 1971, which prohibits corporations from making contributions or expenditures in connection with elections for federal office. On appeal, the NRA argues that its payments fall into various statutory and regulatory exceptions to the general prohibition on corporate contributions. Alternatively, the NRA argues that because it is a not-for-profit organization formed to promote the political views of its members, applying the Act to its activities violates the First Amendment. We reject the NRA's statutory claims, as well as its constitutional challenge with respect to the 1978 and 1982 election cycles. Although the NRA does promote the political views of its members, the substantial contributions it received from for-profit corporations in those two years justify the application of the Act. But because the corporate contributions the NRA received in 1980 were de minimis, we agree that, on the record before us, the Act cannot constitutionally be applied to the NRA's activities for that year.

I

■ The Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. §§ 431–455, regulates the financing of campaigns for federal office. Section 441b(a) prohibits corporations (and labor organizations, which are not involved in this case) from making "a contribution or expenditure in connection with any [federal] election" and also prohibits "any candidate, political committee, or other person [from] knowingly . . . accept[ing] or receiv[ing] any

contribution prohibited by this section." *Id.* § 441b(a). For the purposes of this section, the Act defines "contribution or expenditure" as "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value . . . to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section." *Id.* § 441b(b)(2).

■ In *FEC v. Massachusetts Citizens for Life, Inc.* ("*MCFL*"), the Supreme Court articulated the justification for the regulation of corporate political activity:

We have described that rationale . . . as the need to restrict the influence of political war chests funneled through the corporate form, to eliminate the effect of aggregated wealth on federal elections, to curb the political influence of those who exercise control over large aggregations of capital, and to regulate the substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization.

479 U.S. 238, 257, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (internal citations omitted). FECA thus "protect[s] the integrity of the marketplace of political ideas" from the "corrosive influence of concentrated corporate wealth." *Id.*

■ Notwithstanding FECA's prohibition against corporate contributions to election campaigns, the statute does permit corporations to participate in the electoral process in a limited fashion. Section 441b(b)(2)(C) allows corporations to make expenditures for "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, [or] membership organization." 2 U.S.C. § 441b(b)(2)(C). Though the treasuries of a corporation and

its fund must be kept separate, *Pipefitters Local Union No. 562 v. United States,* 407 U.S. 385, 414, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972), a corporation can nonetheless control how the separate segregated fund spends its money, *FEC v. Nat'l Right to Work Comm., Inc.,* 459 U.S. 197, 200 n. 4, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982); 11 C.F.R. § 114.5(d).

At issue in this case are campaign-related payments made by appellant, the National Rifle Association, a not-for-profit membership organization, and its lobbying and fund-raising division, the NRA Institute for Legislative Action ("ILA"), on behalf of the Political Victory Fund ("PVF"), the NRA's separate segregated fund created pursuant to section 441b(b)(2)(C). During the 1978, 1980, and 1982 federal election cycles, the NRA paid $37,833 worth of PVF election related expenses for, among other things, direct mail campaigns for and against individual candidates, as well as production and mailing of pro- and anti-candidate bumper stickers and brochures. The PVF distributed these materials to NRA members, firearm dealers, gun and sportsmen clubs, and gun shows. NRA money also paid for newspaper advertising, telephone banks, and a fund-raising breakfast for an individual candidate. The PVF thereafter reimbursed the NRA and reported the payments to the Federal Election Commission as independent expenditures.

Suspicious of the PVF's expenditures, the Commission commenced administrative proceedings, subsequently finding "reason to believe" that the NRA, ILA, and PVF had violated FECA. 2 U.S.C. § 437g(a)(2). After conciliation efforts failed, the Commission found "probable cause to believe" that the three organizations had violated the statute. *Id.* § 437g(a)(4)(A)(i). Following the failure of additional conciliation efforts, the Commis-

sion filed suit seeking declaratory and injunctive relief in the United States District Court for the District of Columbia pursuant to section 437g(a)(6)(A), which authorizes the Commission to seek civil enforcement of the Act. *See FEC v. NRA,* No. 85–1018, at 4–5 (D.D.C. July 27, 1999) (describing the proceedings before the Commission).

Defending its actions, the NRA argued that its payments on behalf of the PVF were "establishment" and "administration" expenses permitted by section 441b(b)(2)(C) and FEC regulations. 2 U.S.C. § 441b(b)(2)(C); 11 C.F.R. § 114.1(b). Citing *MCFL,* the NRA also challenged the constitutionality of the Act as applied to NRA activities. In *MCFL,* the Court carved out an exception from section 441b for certain political not-for-profit corporations. 479 U.S. at 254–55, 259–63, 107 S.Ct. 616. Because such organizations do not present the dangers addressed by the statute—contributions by for-profit corporations to political campaigns—the Court held that requiring them to create separate segregated funds to finance their political activities unconstitutionally burdens their First Amendment free speech rights. *Id.*

On cross motions for summary judgment, the district court found that because the NRA made payments from its corporate treasury for the PVF's electioneering expenses and because the PVF accepted those payments, the NRA, ILA, and PVF all violated FECA section 441b. Persuaded by the Commission's interpretation of "establishment" costs as limited to initial costs incurred in setting up and running political committees, the district court concluded that the NRA's payments did not fall under section 441b(b)(2)(C)'s exception for establishment, administration, and solicitation costs. *FEC v. NRA,* No. 85–1018, at 11. The court also rejected the

NRA's constitutional challenge, *id.* at 12, finding that because the organization had not been formed for the express purpose of promoting political ideas, and because it had no policy against accepting corporate contributions, it could not qualify for an *MCFL* exception. Mem. & Order Denying Def.'s Mot. for Recons., *FEC v. NRA*, No. 85–1018, at 3 (D.D.C. Aug. 1, 1995). The court imposed a $25,000 fine on the NRA and ILA, finding them jointly and severally liable, and a separate $25,000 fine on the PVF. Final Order & J., *FEC v. NRA*, No. 85–1018 (D.D.C. Apr. 3, 2000). Renewing their statutory and constitutional arguments, all three organizations appeal.

## II

The NRA divides the payments it made on behalf of the PVF into three categories: payments to third-party vendors, in-kind payments, and payments for employee time. According to the Commission, all payments amounted to illegal corporate contributions because they were "advance[s]" of funds within the meaning of section 441b(b)(2) and were made "in connection with" a federal election. 2 U.S.C. §§ 441b(b)(2), 441b(a). The NRA argues that because the PVF fully reimbursed the NRA, and because the payments fell into various statutory and regulatory exceptions, they were not "contributions" prohibited by the Act. We consider each category in turn.

### *Payments to Third–Party Vendors*

The NRA paid $3,710.56 to third-party vendors for services related to the production of election advocacy materials. The services included the design, layout, and preparation of mechanical art; typography for an anti-candidate brochure; and data processing and printing for candidate endorsement letters.

According to the NRA, these payments did not run afoul of the Act because they fell within section 441b(b)(2)(C)'s exception for the "establishment [and] administration" costs of the corporation's separate segregated fund. *Id.* § 441b(b)(2)(C). FEC regulations define establishment and administration costs as "the cost of office space, phones, salaries, utilities, supplies, legal and accounting fees, fund-raising and other expenses incurred in setting up and running a separate segregated fund." 11 C.F.R. § 114.1(b). Declaring that this regulation is "not intended to be read restrictively," the NRA argues that the definition covers "direct financial support to the dissemination of communications advocating the election or defeat of candidates in federal elections." Appellant's Opening Br. at 22. "Were [such expenditures] not provided by the corporation," the NRA explains, "[they] would be an administrative burden on the ... fund which would substantially diminish the amount of money available for contributions and expenditures." *Id.* at 22–23.

█ The NRA's argument suffers from two defects. First, neither the statute nor the regulation requires separate segregated funds to reimburse their corporations for legitimate administrative expenses. If the NRA's payments to thirdparty vendors qualified as such expenses, why did the PVF reimburse the NRA? Second, the Commission flatly rejects the NRA's expansive reading of section 114.1(b). According to the Commission, that section permits corporations to pay only for the general administrative overhead and start-up costs of their separate segregated funds—not for expenses incurred in producing express electoral advocacy. The Commission points out that another section of its regulations expressly provides that "[a] corporation ... may not use the establishment, administration, and solicita-

tion process as a means of exchanging treasury monies for voluntary contributions." 11 C.F.R. § 114.5(b).

 We review the Commission's interpretation of its own regulations pursuant to "an exceedingly deferential standard." *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 625 (D.C.Cir.2000). An agency's interpretation "will prevail unless it is plainly erroneous or inconsistent with the plain terms of the disputed regulation." *Everett v. United States*, 158 F.3d 1364, 1367 (D.C.Cir.1998) (internal quotation omitted). Applying this standard, we see no basis for questioning the Commission's interpretation of section 114.1(b) as allowing corporations to cover only the overhead and start-up costs of their separate segregated funds. The regulation's list of covered expenses—"office space, phones, salaries, utilities, supplies, legal and accounting fees, fund-raising and other expenses incurred in setting up and running a separate segregated fund"— suggests, as the Commission argues, that the regulation covers only expenses for administrative overhead, not, as the NRA claims, for production and distribution of political materials. Moreover, pointing out that FECA section 441b(b)(2)(C) does not require reimbursement of administrative payments, the Commission argues that treating direct support for production and dissemination of political materials as administrative expenses would enable corporations to use section 441b(b)(2)(C) to dispense money from their treasuries to pay for direct political activity—precisely what the statute forbids. Indeed, as the Commission repeatedly emphasizes, section 441b requires strict segregation of corporate and fund monies, a purpose that would be undermined by the NRA's broad interpretation of administrative costs. In support of this view, the Commission cites *Pipefitters* for the proposition that section

441b's predecessor statute was intended to provide

> a strong prohibition on the use of corporate and union treasury funds to reach the general public in support of, or opposition to, Federal candidates and a limited permission to corporations and unions ... to make political contributions and expenditures financed by voluntary donations which have been kept in a separate segregated fund.

407 U.S. at 431, 92 S.Ct. 2247.

We are equally unpersuaded by the NRA's argument that its payments to third-party vendors were legal because they were reimbursed and "made ... for the administrative convenience of [the] PVF." Appellant's Opening Br. at 24. Because virtually any reimbursed payment by a corporation to or for its separate segregated fund could be so characterized, the NRA's interpretation of section 441b(b)(2)(C)'s administrative cost exception would eviscerate the distinction between corporations and their funds and swallow the statute's prohibition on corporate advances.

### In-Kind Contributions

During the three election cycles at issue in this case, the NRA provided the PVF with $26,076.76 worth of goods and services. These in-kind contributions from NRA in-house inventories and facilities included envelopes, postage, data processing, photocopying, mail and machine room processing, and graphics work, all of which the PVF used to produce and distribute advocacy materials for various election campaigns.

In defense of these payments, the NRA cites section 114.9(c) of the Commission's regulations: "Any person who uses the facilities of a corporation or labor organization to produce materials in connection with a Federal election is required to reim-

burse the corporation or labor organization within a commercially reasonable time for the normal and usual charge for producing such materials in the commercial market." 11 C.F.R. § 114.9(c). The NRA then points out that the statute defines "person" as "an individual, partnership, committee, association ... or any other organization or group of persons." 2 U.S.C. § 431(11). According to the NRA, these provisions, when read together, authorize a separate segregated fund—a "committee" under the terms of the statute—to use corporate facilities as long as the fund reimburses the corporation. The NRA argues that because the PVF reimbursed the NRA within a commercially reasonable period of time—a claim not disputed by the Commission—the in-kind payments did not violate FECA.

The Commission responds that section 114.9(c) applies only to the use of corporate facilities by stockholders and employees engaged in individual volunteer activity. According to the Commission, it never intended section 114.9(c) to apply to financial transactions between corporations and their separate segregated funds, which are subject to a different section of the regulations—section 114.5. *See* FEC Advisory Opinion 1984-24, 1 Fed. Election Campaign Fin. Guide (CCH) ¶ 5771, at 11,083 (concluding that 11 C.F.R. § 114.9(c) applies only to the use of corporate facilities by individuals engaged in their own volunteer activities and does not authorize a reimbursement payment method for separate segregated funds). The Commission explains that it created different rules for separate segregated funds because "[t]he relationship between a corporation ... and its own separate segregated fund is unique and raises concerns about circumvention of the prohibition in section 441b that are not presented by others that are not acting under the corporation's ... control and for its benefit." Appellee's Br. at 29.

The legality of the NRA's in-kind contributions, like the legality of its payments to third party vendors, turns on the Commission's interpretation of its own regulations, so our review is again at its most deferential. *See Trinity Broad.*, 211 F.3d at 625. Not only has the NRA given us no basis for questioning the Commission's reasonable reading of section 114.9(c), but the Commission's position comports well with FECA's basic purpose: keeping corporate and fund treasuries separate. Because the relationship between corporations and their separate segregated funds presents risks that do not arise when individuals use corporate facilities, it makes perfect sense for the Commission to distinguish between corporations and individuals, prohibiting reimbursement arrangements for the former but not for the latter.

### Payments for Employee Time

During the 1980 election cycle, several NRA employees worked for the PVF on the campaigns of two candidates for the House of Representatives. During that time, the employees earned $3,729.64 from the NRA. The PVF reimbursed the NRA within 30 days. In defense of this arrangement, the NRA points to the definition of "contribution" contained in section 431, the statute's general definition section:

> The term contribution includes—(i) any gift, subscription, loan, advance, or deposit ... or anything of value made by any person for the purpose of influencing any election for Federal office; or (ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

184

2 U.S.C. § 431(8)(A). The NRA contends that because the PVF reimbursed it for the $3,729.64 worth of employee time, the employees' services were not provided "without charge." According to the NRA, it would have been "absurd" for Congress to have intended section 431(8)(A)(ii) to require candidates to pay for personal services either in advance or at the very moment those services are rendered. Reading the Act that way, the NRA argues, would prevent candidates from using temporary employment agencies without paying in advance.

We think the NRA misreads the statute. Section 431(8)(A)(ii) has nothing to do with this case. The issue here relates to whether the NRA's payments amounted to illegal corporate contributions within the meaning of section 441b(b)(2), which contains its own definition of contribution: "For the purposes of this section ... the term 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value." This definition includes nothing comparable to section 431(8)(A)(ii)'s provision regarding "personal services" provided "without charge."

In Advisory Opinion 1984–24, moreover, the Commission expressly ruled that a corporation—in that case the Sierra Club—may not provide to its separate segregated fund the services of its employees to work on congressional campaigns, even if the fund fully reimburses the corporation within thirty days. 1 Fed. Election Campaign Fin. Guide at 11,082–83. Stating that a "corporation's donation of the services of its employees and the use of its facilities incident to its employees' services qualifies as a gift of something of value to the candidate," *id.* at 11,083, the Commission explained:

[T]he initial disbursement of corporate treasury monies is a loan, advance, or something of value to both the candidate and the corporation's separate segregated fund.... None of the exceptions in the Act or regulations remove such a disbursement from the general prohibition of § 441b.... [O]nce the [corporation] disburses its treasury funds to pay an employee for political services rendered to a Federal candidate, ... the [corporation] makes a prohibited contribution or expenditure and a violation of the Act occurs.... [A] reimbursement payment method ... does not cause the violation to abate.

*Id.*

█ In response, the NRA, relying on *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), argues that FEC advisory opinions are entitled to no deference. We disagree. Distinguishing between interpretive rules and guidelines on the one hand and "norms that derive from the exercise of the Secretary's delegated lawmaking powers" on the other, *Christensen* declined to give deference to an opinion letter issued by a division of the Department of Labor. *Id.* at 587, 120 S.Ct. 1655 (quoting *Martin v. OSHRC*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). The critical *Christensen* passage reads:

[We] confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference. Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skid-*

*more v. Swift*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *Id.* (internal citations omitted). Just last week, the Supreme Court, citing *Christensen*, declined to give *Chevron* deference to U.S. Customs Service ruling letters. *United States v. Mead Corp.*, — U.S. ——, 121 S.Ct. 2164, 2174, 150 L.Ed.2d 292 (2001).

■ We have previously considered *Christensen*'s implications for the deference owed to FEC interpretations of FECA, though in a different context: an FEC probable cause determination made pursuant to FECA section 437g(a)(4). *See In re Sealed Case*, 223 F.3d 775, 779 (D.C.Cir.2000). Pointing out that *Christensen* "appeared to make the interpretation's legal effect the touchstone," *id.* at 780, we held that, for several reasons, the probable cause determination and its underlying statutory interpretation had sufficient legal effect to warrant *Chevron* deference. *Id.* at 780–81. First, the Commission makes probable cause determinations pursuant to detailed statutory procedures analogous to formal adjudication. *Id.* at 780. The FEC's interpretation of its statute therefore assumes a "form expressly provided for by Congress." *Id.* (citing *Martin*, 499 U.S. at 157, 111 S.Ct. 1171). Second, in making probable cause determinations, the Commission fulfills its statutorily granted responsibilities, giving ambiguous statutory language concrete meaning through case-by-case adjudication. *Id.* Finally, the Commission itself—not its staff—makes probable cause determinations, which in the case of a "no probable cause" finding precludes further FEC enforcement. *Id.*

■ FEC advisory opinions possess the same three characteristics. First, FECA section 437f establishes a detailed framework for issuing advisory opinions. Any candidate, person, or authorized committee may request an opinion concerning the statute's application to a "specific transaction." 2 U.S.C. § 437f(a)(1). The Commission must make public all requests for advisory opinions and "shall accept written comments submitted by any interested party." *Id.* § 437f(d). Second, in issuing advisory opinions, the Commission fulfills its statutorily granted responsibility to interpret the Act. *See, e.g., id.* § 437f(a)(1). Indeed, a House Report concerning later amendments to FECA says quite specifically that "[t]he Committee reaffirms its opinion that the advisory opinion process is central to the Commission's responsibility to clarify the Act." H.R. REP. No. 96–422, at 20 (1979); *cf. FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) (concluding that the FEC is "precisely the type of agency to which deference should presumptively be afforded"). In pre-*Christensen* cases involving advisory opinions, we too have acknowledged that section 437f authorizes the Commission to formulate general policy with respect to the Act's administration and to resolve ambiguities in the statute's language. *See, e.g., Orloski v. FEC*, 795 F.2d 156, 164 (D.C.Cir.1986); *cf. In re Sealed Case*, 237 F.3d 657, 670 (D.C.Cir. 2001) (concluding that "choices made by FEC attorneys—without the Commission's ratification and acceptance—do not stand as the authoritative interpretation of the agency requiring deference"). Finally, advisory opinions have binding legal effect on the Commission. Any person involved in either the specific transaction or another materially indistinguishable transaction may rely on the opinion. 2 U.S.C. § 437f(c)(1). As the Commission pointed out at oral argument, the statute creates a "safe harbor" for parties who rely on advisory opinions, providing that "any person who ... acts in good faith in accordance

with the provisions and findings of such ... opinions shall not ... be subject to any sanction provided by this Act." *Id.* § 437f(c)(2).

To be sure, Advisory Opinion 1984–24 involved the Sierra Club, not the NRA, whereas the parties to *In re Sealed Case,* 223 F.3d 775, were the same parties involved in the earlier probable cause determination. But this is a distinction without a significant difference. Our decision in *In re Sealed Case* to give *Chevron* deference to the probable cause determination had nothing to do with the fact that the case and the earlier proceedings involved the same parties. The difference between this case and *In re Sealed Case,* moreover, does nothing to change the fact that FEC advisory opinions not only reflect the Commission's considered judgment made pursuant to congressionally delegated lawmaking power, but also have binding legal effect.

The appropriateness of giving FEC advisory opinions *Chevron* deference is reinforced by the significant differences between them and the Labor Department letter at issue in *Christensen.* Unlike FEC advisory opinions, the Labor Department letter bound neither the requesting party nor the agency, nor was the letter the product of a statutorily created decision-making process. Rather, the Labor Department official who issued the letter did so pursuant to informal agency procedures. Virtually every relevant post-*Christensen* decision has declined to give *Chevron* deference to just this type of informal agency action. *See, e.g., Scales v. INS,* 232 F.3d 1159, 1165 (9th Cir.2000) (concluding that a State Department Foreign Affairs Manual is not entitled to deference because the Attorney General, not the State Department, has statutory authority to interpret immigration statutes); *Madison v. Res. for Human Dev.,* 233

F.3d 175, 185–87 (3d Cir.2000) (denying *Chevron* deference to interpretations of FLSA authorized by the Secretary of Labor as interpretive guidelines with no legal effect); *United States v. 162 Megamania Gambling Devices,* 231 F.3d 713, 719 (10th Cir.2000) (concluding that opinion letters issued by the National Indian Gaming Commission are not entitled to *Chevron* deference); *Ball v. Memphis Bar–B–Q Co.,* 228 F.3d 360, 365 (4th Cir.2000) (concluding that a statutory interpretation advanced by the Secretary of Labor as a litigating position in an amicus brief was entitled only to *Skidmore* deference); *Utah Wilderness Alliance v. Dabney,* 222 F.3d 819, 829 (10th Cir.2000) (holding that agency policies still in draft form are not entitled to *Chevron* deference); *Bussian v. RJR Nabisco, Inc.,* 223 F.3d 286, 296–97 (5th Cir.2000) (finding that although public notice was given of a proposed rulemaking, the notice did not focus on the issue involved in a DOL interpretive bulletin, which lacked the force of law, and was therefore not entitled to *Chevron* deference). FEC advisory opinions are equally distinguishable from the U.S. Customs Service ruling letter at issue in *Mead*: the Court there found "no indication that Congress meant to delegate authority to Customs to issue classification rulings with the force of law." *Mead,* —— U.S. ——, 121 S.Ct. 2164, 2172, 150 L.Ed.2d 292.

 This brings us to the *Chevron* question presented by the NRA's payments for employee time: does Advisory Opinion 1984–24 represent a "permissible construction of the statute"? *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We think it does. To begin with, interpreting "advance" to include a corporation's payment of its employees to work for its separate segregated fund is consistent with the statute's

language. Although there may be other possible interpretations, *Chevron* deference does not require that we "conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading the court would have reached." *Id.* at 843 n. 11, 104 S.Ct. 2778; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C.Cir.1998) ("[U]nder *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable—regardless whether there may be other reasonable, or even more reasonable, views."). As the Commission explains, moreover, its interpretation would not restrict candidates from using temporary employment agencies without paying in advance. The extension of credit by an employment agency, the Commission points out, would constitute a perfectly legal arm's length commercial transaction. But because the NRA does not engage in the business of contracting out its employees, allowing the PVF to use NRA employees for campaign work is not "in the ordinary course of [the] corporation's business." 1 Fed. Election Campaign Fin. Guide at 11,083. Permitting reimbursement arrangements such as the one at issue here would thus compromise the separation of corporate and fund treasuries—a separation that both Congress and the Supreme Court consider essential to preventing the use of corporate wealth to fund political advocacy. *See Pipefitters*, 407 U.S. at 414, 92 S.Ct. 2247.

## III

Having rejected the NRA's statutory claims, we turn to its as-applied constitutional challenge. The NRA contends that as a political, not-for-profit membership organization, it is exempt from FECA under the Supreme Court's decision in *FEC v. Massachusetts Citizens for Life*. In *MCFL*, the Supreme Court sustained the Massachusetts Citizens for Life's as-ap-

plied challenge to the statute, finding that section 441b, by encompassing all corporations, swept too broadly. 479 U.S. at 263, 107 S.Ct. 616. The Court observed that the Act's requirement that corporations establish separate segregated funds to finance their political activities amounts to a substantial burden that threatens to discourage organizations from engaging in political speech:

These [FECA regulations] may create a disincentive for such organizations to engage in political speech. Detailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear. Furthermore, such duties require a far more complex and formalized organization than many small groups could manage. Restriction of solicitation of contributions to "members" vastly reduces the sources of funding for organizations with either few or no formal members, directly limiting the ability of such organizations to engage in core political speech. It is not unreasonable to suppose that, as in this case, an incorporated group of like-minded persons might seek donations to support the dissemination of their political ideas and their occasional endorsement of political candidates, by means of garage sales, bake sales, and raffles. Such persons might well be turned away by the prospect of complying with all the requirements imposed by the Act. Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports, and to monitor garage sales lest nonmembers take a fancy to the merchandise on display, it would not be surprising if at least some groups decid-

ed that the contemplated political activity was simply not worth it.

*Id.* at 254–55, 107 S.Ct. 616. At the same time, the Court acknowledged that the statute's "concern over the corrosive influence of concentrated corporate wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas." *Id.* at 257, 107 S.Ct. 616. This concern justifies imposing such a burden in some cases to prevent "resources amassed in the economic marketplace" from being "used to provide an unfair advantage in the political marketplace." *Id.*; *see also id.* at 258–59, 107 S.Ct. 616.

Balancing these interests, the Court concluded that FECA could not constitutionally be applied to an organization like the MCFL:

> MCFL was formed to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the economic marketplace, but its popularity in the political marketplace. While MCFL may derive some advantages from its corporate form, those are advantages that redound to its benefit as a political organization, not as a profit-making enterprise. In short, MCFL is not the type of traditional corporation organized for economic gain that has been the focus of regulation of corporate political activity.

*Id.* at 259, 107 S.Ct. 616 (internal citations omitted); *see also id.* at 263, 107 S.Ct. 616. In support of this conclusion, the Court pointed to several characteristics of the MCFL that made it look more like a "[v]oluntary political association" than a traditional business corporation. *Id.* at 263, 107 S.Ct. 616. First, MCFL members formed the organization and participated in its activities for the express purpose of promoting its political ideas. *Id.* at 264, 107 S.Ct. 616. Second, individuals connected with the MCFL, unlike corporate shareholders, would have had no economic reason to continue their association with the organization if they disagreed with its political positions. *Id.* Finally, because of the MCFL's policy against accepting corporate contributions, the organization could not become a conduit for direct corporate spending on election campaigns. *Id.*

A few years later, the Court explored the limits of the *MCFL* exception in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). There, the Michigan Chamber of Commerce challenged the constitutionality of a state campaign finance statute modeled on FECA. Again applying a demanding standard of review, the Court asked whether the statute "burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest." *Id.* at 657, 110 S.Ct. 1391. This time, however, the Court upheld the statute, concluding that the Michigan Chamber of Commerce was not the type of voluntary, political organization that qualified for the *MCFL* exception. To begin with, as the Court pointed out, not all Chamber goals were inherently political. *Id.* at 669, 110 S.Ct. 1391. "Unlike MCFL's, the Chamber's educational activities are not expressly tied to political goals; many of its seminars, conventions, and publications are politically neutral and focus on business and economic concerns." *Id.* at 662, 110 S.Ct. 1391. Moreover, though the Chamber "lacks shareholders, many of its members may be similarly reluctant to withdraw as members even if they disagree with the Chamber's political expression, because they wish to benefit from the Chamber's nonpolitical programs and to establish contacts with the other members of the business community." *Id.* at 663, 110 S.Ct. 1391. Finally, because

more than three-fourths of Chamber members were corporations, the organization ran the risk of becoming precisely the type of conduit for corporate funding that the campaign finance statute was designed to prevent. *Id.* at 664, 110 S.Ct. 1391.

Before addressing the NRA's reasons for believing that it resembles the MCFL, not the Chamber, we pause to consider the Commission's contention that because the NRA failed to raise its constitutional defense in either its answer or a subsequent amendment, the issue is not properly before us. *See Harris v. Sec'y, U.S. Dep't of Veterans Affairs,* 126 F.3d 339, 345 (D.C.Cir.1997) (holding that "a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion"). According to the NRA, it did raise the constitutional defense by bringing the *MCFL* decision to the district court's attention in a "Notice of Related Decision" filed on January 6, 1987. We agree that this was sufficient. The requirement that a party raise affirmative defenses in a responsive pleading is designed to "give[ ] the opposing party notice of the defense ... and permit[ ] the party to develop in discovery and to argue before the District Court various responses to the ... defense." *Harris,* 126 F.3d at 343. The record demonstrates that the Commission had notice of the NRA's constitutional claim, conducted discovery on the issue, and had ample opportunity to respond.

The NRA claims entitlement to an *MCFL* exception because the organization has features "more akin to voluntary political associations than business firms." *MCFL,* 479 U.S. at 263, 107 S.Ct. 616. Like the MCFL, the NRA was not formed to amass capital, and its resources reflect not the "economically motivated decisions of investors and customers, but rather its popularity in the political marketplace."

Appellant's Opening Br. at 33. The very first goal listed in the NRA's bylaws is:

> To protect and defend the Constitution of the United States, especially with reference to the inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, transport, carry, transfer ownership of, and enjoy the right to use arms, in order that the people may always be in a position to exercise their legitimate individual rights of self-preservation and defense of family, person, and property, as well as to serve effectively in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens.

*NRA Bylaws,* Art. I, § 1. Moreover, the NRA tells us that, like the MCFL, "NRA members and supporters, unlike shareholders of a business corporation, 'are fully aware of its political purposes, and in fact contribute precisely because they support those purposes.' " Appellant's Opening Br. at 34 (quoting *MCFL,* 479 U.S. at 260–61, 107 S.Ct. 616).

The NRA acknowledges that it differs from the MCFL in some respects. For example, the NRA sponsors seemingly non-political activities, such as firearm competitions and training classes, and provides non-political goods and services to its members, such as magazines, fraternal items, and accident insurance. The organization also has no policy against accepting corporate contributions. According to the NRA, however, none of these differences disqualifies it from an *MCFL* exception. The organization's non-political activities and the individuals participating in them are "supportive of, and enmeshed with, its primary, and plainly political, purpose." *Id.* at 36. The NRA's political mission, moreover, extends well beyond defending the right to bear arms and includes the promotion of "public safety, law

and order, ... the national defense,.... hunter safety, ... and hunting as a shooting sport." *NRA Bylaws,* Art. I, §§ 2–5. Finally, the NRA argues, because contributions received from for-profit corporations during the three years at issue in this case amounted to an "insignificant portion of [its total] revenues," its "actual practice was tantamount to such a policy [prohibiting contributions]." Appellant's Opening Br. at 37.

The NRA also distinguishes itself from the Michigan Chamber of Commerce. Not only did the Chamber compile and disseminate information relating to social, civic, and economic conditions unrelated to any political objectives, but its publications focused primarily on business and economic issues. By contrast, the NRA claims that its publications and activities all relate to its political goals. The NRA also contends that, unlike the Chamber, it neither was established by business corporations nor has for-profit corporate members. For these reasons, the NRA believes that, in contrast to the Chamber, it does not risk becoming a conduit for direct corporate spending on election campaigns.

The Commission has a very different view of the NRA. In contrast to the MCFL, described by the Commission as having a narrow political focus, the NRA performs a wide variety of services for its members, only some of which are political in nature. The Commission points out that in the 1970s the NRA amended its corporate charter to include the education and training of "citizens of good repute in the safe and efficient handling of small arms" and the promotion of "public safety, hunter safety, ... [and] efficiency in the use of such arms on the part of members of law enforcement agencies [and] of the armed forces." *Certificate of Amendment of the Certificate of Incorporation,* May 9, 1978. The NRA also sponsors shooting competitions, sells accidental death and dismemberment insurance, helps train the United States Olympic shooting team, and provides grants for wildlife studies. According to the Commission, the NRA's business activities, including its sales of magazines and fraternal items, also distinguish it from the MCFL, whose resources came from garage sales, bake sales, dances, raffles, and picnics. *MCFL,* 479 U.S. at 242, 107 S.Ct. 616.

As to the issue of corporate contributions, the Commission reads *MCFL* and *Austin* as establishing a prophylactic requirement that an organization have a policy against accepting such contributions in order to qualify for an *MCFL* exception. According to the Commission, because the NRA has no policy against corporate contributions, and because it accepted such contributions during the election cycles at issue in this case, the organization should not be exempted from the Act.

In deciding how to resolve this debate and whether to apply section 441b to the NRA, we tread within closely guarded First Amendment territory. FECA "operate[s] in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Precisely because of the fundamental freedoms at stake, *MCFL* rejected a rigid, bright-line interpretation that would have subjected all corporations to FECA requirements, fearing that such an approach might unduly burden "core political speech." *See* 479 U.S. at 263, 107 S.Ct. 616. Instead, "[w]here at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the

danger that has prompted regulation." *Id.* at 265, 107 S.Ct. 616.

▮ As we read *MCFL* and *Austin,* the Commission must demonstrate that the NRA's political activities threaten to distort the electoral process through the use of resources that, as *MCFL* put it, reflect the organization's "success in the economic marketplace" rather than the "power of its ideas." *Id.* at 258–59, 107 S.Ct. 616. And because important First Amendment rights are involved, the Commission "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (internal citation omitted); *see also Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 803 n. 22, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("[This Court] may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity.").

▮ Applying this demanding standard, we think the Commission has failed to demonstrate that the NRA resembles a business firm more closely than a voluntary political association. The NRA repeatedly emphasizes not only that its political and non-political activities interrelate, but also that its members join precisely because all NRA activities are enmeshed in the organization's core political purpose—defending the constitutional right to bear arms. Although the Commission had full discovery, it offers no factual basis for questioning these claims. It merely asserts that the "variety of activities [the NRA] actually undertook reinforces [the] conclusion" that the NRA's purposes are not strictly political. Appellee's Br. at 40.

This is not enough. To justify subjecting the NRA to FECA regulation, the Commission must actually demonstrate that, as in the case of the Michigan Chamber of Commerce, the NRA's political advocacy is sufficiently distinct from its allegedly non-political activities such that members who disagree with the former are still likely to participate in the latter.

This conclusion, however, does not end our task. Notwithstanding the fact that, on this record, the NRA appears to be a voluntary political association akin to the MCFL, we must determine whether the corporate contributions it received in the three years at issue nevertheless justify subjecting it to FECA's requirements. After all, the Supreme Court never would have exempted the MCFL had there been evidence that, even given the organization's core political mission, it had accepted substantial corporate contributions that it could have used for campaign purposes.

▮ To begin with, we are unpersuaded by the Commission's argument that the absence of a policy against the receipt of corporate contributions automatically makes the NRA ineligible for an *MCFL* exception. As we read *Austin,* the Court relied not on the Chamber's failure to have a policy against corporate contributions, but rather on the likelihood that the Chamber could become a conduit for political spending by its corporate members. The Court emphasized that over three fourths of Chamber members were corporations and that they "could circumvent the Act's restrictions by funneling money through the Chamber's general treasury." *Austin,* 494 U.S. at 664, 110 S.Ct. 1391. All three of our sister circuits to have addressed this issue have read *Austin* as we do. *See N.C. Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 714 (4th Cir.1999) (holding that courts should be concerned with the amount of contributions received

and whether the "acceptance of those contributions means that [the organization] is serving as a conduit for the type of direct spending by for profit corporations that creates a threat to the political marketplace") (internal quotation omitted); *FEC v. Survival Educ. Fund, Inc.*, 65 F.3d 285, 292–93 (2d Cir.1995) (noting that "[t]he only concern that justifies application of § 441b to nonprofit political advocacy corporations is the prospect that business firms or labor unions would funnel their wealth, which derives from the commercial marketplace, into the political marketplace of ideas," and not the absence of a policy against corporate contributions); *Day v. Holahan*, 34 F.3d 1356, 1364 (8th Cir.1994) (holding that a corporate expenditures statute could not be applied constitutionally to a not-for profit organization that received no "significant contributions from for-profit corporations," even though it did not have a policy against such contributions). Were we to interpret *Austin* differently, an organization that has no policy banning corporate contributions but that nevertheless receives no such contributions would be subject to the statute despite the fact that it would not be serving as a conduit for corporate campaign contributions. We agree with the Second Circuit that a not-for-profit organization with no corporate ties "does not surrender its First Amendment freedoms for the want of . . . a policy" against corporate contributions. *Survival Educ. Fund*, 65 F.3d at 293.

 Like our sister circuits, we therefore focus not on the absence of a policy against corporate contributions, but on whether such contributions could have turned the NRA into a potential conduit for corporate funding of political activity. In 1978 and 1982, the NRA received $7000 and $39,786, respectively, in contributions from for-profit corporations. We disagree

with the NRA that because these contributions represented a small percentage of its total revenues, they were de minimis and thus beyond the Act's purview. *See Day*, 34 F.3d at 1365 ("[T]he key issue here is the *amount* of for-profit corporate funding a nonprofit receives.") (emphasis added). The harm contemplated by the statute stems from the absolute amount of corporate money an organization has to spend in the political process, not from the relationship between corporate contributions and the organization's total revenues. *But see N.C. Right to Life*, 168 F.3d at 714 (holding that because corporate contributions represented a "modest *percentage*" of the right to life organization's revenues, the organization qualified for the nonprofit exemption) (emphasis added); *Survival Educ. Fund*, 65 F.3d at 293 (same). Because corporate contributions in 1978 and 1982 were substantial, we see no constitutional barrier to applying the Act to the NRA for those two years.

But 1980 is a different matter. In that year, the NRA received only $1000 in corporate contributions. Hinting that the actual amount might be greater, the Commission points out that the organization did not record corporate contributions of less than $500. But First Amendment rights cannot turn on such speculation. *See Turner*, 512 U.S. at 664, 114 S.Ct. 2445. The Commission also points to the substantial revenues the NRA received from corporate advertising in ·its magazines, yet offers nothing to suggest that the purchasing of advertisements was not legitimate. Because we consider the $1000 to be de minimis, and because the Commission, as an alternative to its argument that the NRA lacks a policy against corporate contributions, does not claim that even this small amount demonstrates that the organization was serving as a conduit for corporate funding of election campaigns, we hold that the Act cannot consti-

tutionally be applied to the NRA for the 1980 election cycle.

## IV

The decision of the district court is vacated, and this matter is remanded with instructions to recalculate the penalties based on the 1978 and 1982 violations.

*So ordered.*

GINSBURG, Circuit Judge, concurring:

I write separately to point out that the Commission's interpretation of 2 U.S.C. § 441b, to which the court accords deference under *Chevron* step two, *see* Ct. Op. at 186–87, seems to be inconsistent with the statute. Because the NRA failed to argue the point, however — although it feints in the right direction — I join in the court's opinion, leaving the neglected argument to another day when it may be fully developed and debated by the parties.

Section 441b prohibits "any corporation" from making a "contribution or expenditure in connection with any election to any political office." 2 U.S.C. § 441b(a). The statute defines "contribution or expenditure" broadly as

> any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business).

*Id.* § 441b(b)(2). The Commission holds it unlawful for a corporation's employees to provide services for the benefit of a candidate and for which the corporation is reimbursed by its separate segregated fund within a commercially reasonable time; this arrangement, according to the Commission, involves the corporation giving a "loan, advance, or something of value to both the candidate and the corporation's separate segregated fund." FEC Advisory Opinion 1984–24, 1 Fed. Election Campaign Fin. Guide (CCH) ¶ 5771, at 11,083. This near quotation of the statutory definition of "contribution," *see* 2 U.S.C. § 441b(b)(2) ("contribution" means "loan, advance, . . . or anything of value") makes it clear that the Commission views that definition as embracing the extension of ordinary trade credit for the period between rendition of the services and reimbursement therefor.

The Commission's interpretation is not necessarily unreasonable. It does, however, imply that a corporate vendor may not lawfully enter into an ordinary commercial contract with a candidate to provide goods and services for which the candidate will be subsequently and promptly billed. The NRA argues in particular that the Commission's interpretation must be in error because it would be impractical and "absurd" to require a candidate wishing to engage a temporary personnel firm to pay for such services in advance; for the ordinary arrangement whereby services are rendered and the bill then paid would constitute an illegal "loan, advance or something of value" provided to the candidate by the firm. The same might be said also of in-kind contributions, *see* Ct. Op. at 182–83 — although the argument is not relevant to the NRA's third-party contributions, which indisputably are advances, *see* Ct. Op. at 181–82.

The Commission responds to this criticism by invoking its own regulation under which a corporation may "extend credit to a candidate . . . provided that the credit is extended in the ordinary course of a corporation's business and the terms are substantially similar to extensions of credit to nonpolitical debtors." 11 C.F.R. § 114.10(a) (1980), *current version at* 11 C.F.R. § 116.3(b) (2000); *see* 1 Fed. Elec-

tion Campaign Fin. Guide at 11,083 to 11,083–2. By recognizing this "exception in the ... regulations," 1 Fed. Election Campaign Fin. Guide at 11,083, the Commission makes its ban upon rendering services to a candidate in advance of payment applicable only to corporations not acting in the ordinary course of business — such as the NRA or other corporations "more akin to voluntary political associations than business firms," *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 263, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986).

The statute, however, unequivocally prohibits "any corporation" — commercial or ideological — from providing "any ... loan [or] advance," etc., to a candidate without regard to whether it does so in the ordinary course of business. 2 U.S.C. § 441b(a). It is clear, moreover, that the Congress considered whether the Act might prohibit ordinary commercial transactions and crafted an exception to the Act in order to avoid that result: no corporation may make a "loan" to a candidate "except a loan of money by a national or State bank made ... in the ordinary course of business." *Id.* § 441b(b)(2). No such exception is provided for corporations other than banks. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (internal quotations and citations omitted); *see also NextWave Personal Communications, Inc. v. FCC,* 254 F.3d 130, 152–53 (D.C.Cir.2001).

The Commission might reasonably read § 441b strictly and deem an ordinary commercial transaction, that is, one in which performance precedes payment, a prohibit-

ed "loan, advance ... or [ ]thing of value." 2 U.S.C. § 441b(b)(2). Perhaps it could also reasonably permit such a transaction by reading that phrase as not including the extension of ordinary trade credit for services rendered if payment is made within a commercially reasonable time. What the Commission cannot reasonably do, however, is distinguish between the provision of a service by a commercial vendor in the ordinary course of business and the provision of the same service by a noncommercial corporation not in the ordinary course of its business; the statute, with its explicit exception for banks acting in the ordinary course of business, cannot reasonably be read to contain a broader but implicit exception for commercial vendors acting in the ordinary course of business.

Nor do I see how holding that the Commission may not ban the extension of ordinary trade credit by a corporation to a candidate or to its separated segregated fund except when such credit is extended in the ordinary course of business would meaningfully "compromise the separation" between a corporation's treasury and that of its separate segregated fund, *see* Ct. Op. at 187. Were the Commission to construe "advance" broadly, and thus to bar services not paid for in advance — whether provided by a commercial vendor or by any other corporation — that separation would not be affected at all. Were the Commission to construe "loan, advance, ... or anything of value" narrowly, and thus to permit the provision of services by any corporation so long as it was promptly reimbursed by the segregated fund, the corporation presumably would still be required to provide such services upon commercially reasonable terms. That a fund and the candidates it supports could briefly enjoy the time value of not paying for employee services until billed in the ordinary course would in no way alter the relationship between the corporation and

the separate segregated fund envisioned in the Act.