**F I L E D**

**PUBLISH**

**August 21, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

COLORADO RIGHT TO LIFE
COMMITTEE, INC.,

      Plaintiff-Appellee/Cross-
      Appellant,

v.

MIKE COFFMAN,[*] in his official
capacity as Colorado Secretary of
State,

      Defendant-Appellant/Cross-
      Appellee.

————————————————————

COLORADO COMMON CAUSE and
LEAGUE OF WOMEN VOTERS OF
COLORADO.

      Amici Curiae in support of
      Defendant- Appellant/Cross-
      Appellee.

Nos. 05-1519 and 05-1538

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Colorado
Secretary of State Mike Coffman is automatically substituted for former Colorado
Secretary of State Gigi Dennis as the Defendant-Appellant/Cross-Appellee in this
case.

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 03-cv-1454-WDM-PAC)**

Maurice G. Knaizer (with Monica Márquez and John W. Suthers, Attorney General for the State of Colorado, on the briefs), Denver, Colorado for Defendant-Appellant/Cross-Appellee.

James Bopp, Jr. (with Richard E. Coleson on the briefs), Bopp, Coleson & Bostrom, Terre Haute, Indiana for Plaintiff-Appellee/Cross-Appellant.

Martha M. Tierney, Kelly/Haglund/Garnsey+Kahn LLC, Denver, Colorado, filed a brief on behalf of Amici Curiae.

Before **HENRY**, **ANDERSON**, and **HOLMES**, Circuit Judges.

**HENRY**, Circuit Judge.

Article XXVIII of the Colorado Constitution is a citizen-passed campaign finance reform amendment designed to limit the influence of certain types of corporations' general funds on state elections. Colorado Right to Life Committee (CRLC), a non-profit ideological corporation, sought declaratory and injunctive relief against the Colorado Secretary of State, arguing that Article XXVIII contained provisions that interfered with its traditional communications and activities and, thereby, violated its First and Fourteenth Amendment rights under the United States Constitution. The district court granted summary judgment in part to CRLC and in part to the Secretary. The Secretary now appeals, and CRLC

2

cross-appeals.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm. Specifically, we hold that the challenged sections of Article XXVIII regulating corporate expenditures and electioneering communications are unconstitutional as applied to CRLC because CRLC meets Supreme Court-approved exemption requirements for a voluntary ideological corporation that seeks to engage in political speech. *See FEC v. Mass. Citizens for Life*, 479 U.S. 238, 259-60 (1986) (plurality opinion) ("*MCFL*"). In addition, we conclude that Article XXVIII's definition of a political committee is unconstitutional as applied to CRLC because it fails to incorporate *Buckley v. Valeo*'s "major purpose" test. 424 U.S. 1, 79 (1976). Finally, we decline CRLC's invitation to reconsider its remaining facial challenges to various sections of Article XXVIII.

## I. BACKGROUND

## A. Article XXVIII of the Colorado Constitution

In November 2002, Colorado voters, seeking to limit the influence of money on state elections, passed Amendment 27.[1] Amendment 27 amended Article

---

[1] The people of the state of Colorado hereby find and declare . . . that in recent years the advent of significant spending on electioneering communications, as defined herein, has frustrated the purpose of existing campaign finance requirements; that independent research has demonstrated that the vast majority of televised electioneering communications goes beyond issue discussion to express electoral advocacy; that political contributions from corporate treasuries are not an indication of popular support for the corporation's political ideas and can unfairly influence the

(continued...)

3

XXVIII of the Colorado Constitution to prohibit corporations from using their general funds to make contributions, expenditures, and electioneering communications. Section 3(4)(a) of Article XXVIII reads:

> It shall be unlawful for a corporation or labor organization to make contributions to a candidate committee or a political party, and to make expenditures expressly advocating the election or defeat of a candidate; except that a corporation or labor organization may establish a political committee or small donor committee which may accept contributions or dues from employees, officeholders, shareholders, or members.[2]

Section 6(2) further reads:

> Notwithstanding any section to the contrary, it shall be unlawful for a corporation or labor organization to provide funding for an electioneering communication; except that any political committee or small donor committee established by such corporation or labor

---

[1](...continued)
outcome of Colorado's elections; and that the interests of the public are best served by limiting campaign contributions, encouraging voluntary campaign spending limits, providing full and timely disclosure of campaign contributions, independent expenditures, and funding electioneering communications and strong enforcement of campaign finance requirements.

Colo. Const. art. XXVIII, § 1.

[2] "Expressly advocating" is not defined in Article XXVIII. The *Buckley* Court defined express advocacy as "express terms advocat[ing] the election or defeat of a clearly identified candidate for federal office . . . [and advertisements that use terminology] such as 'vote for' 'elect,' 'support,' 'cast your ballot for,' '[Candidate's name] for Congress,' 'vote against,' 'defeat,' [and] 'reject.'" 424 U.S. at 44 & n.52. "*Buckley* adopted the 'express advocacy' requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons." *MCFL*, 479 U.S. at 249.

4

organization may provide funding for an electioneering communication.[3]

However, following the United States Supreme Court's teachings in *MCFL*, Article XXVIII and Secretary of State Rule 4.13 created an exception to the prohibition for corporations that meet three requirements. Section 3(4)(b) provides:

> The prohibition contained in paragraph (a) of this subsection (4) shall not apply to a corporation that:
>
> (I)   Is formed for the purpose of promoting political ideas and cannot engage in business activities; and
>
> (II)  Has no shareholders or other persons with a claim on its assets or income; and
>
> (III) Was not established by and does not accept contributions from business corporations or labor organizations.

---

[3] An electioneering communication is defined as

any communication broadcasted by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences or otherwise distributed that:

(I)   Unambiguously refers to any candidate; and

(II)  Is broadcasted, printed, mailed, delivered, or distributed within thirty days before a primary election or sixty days before a general election; and

(III) Is broadcasted to, printed in a newspaper distributed to, mailed to, delivered by hand to, or otherwise distributed to an audience that includes members of the electorate for such public office.

Colo. Const. art. XXVIII, § 2(7)(a).

Colo. Const. art. XXVIII, § 3(4)(b).  Similarly, Rule 4.13, the Secretary of State

Rules' exception to § 6(2) reads:

> Article XXVIII § 6(2), concerning the prohibition against funding by corporations and labor organizations for electioneering communications, shall not apply to any corporation that:
>
> a.  Was formed for the purpose of promoting political ideas and cannot engage in business activities;
>
> b.  Has no shareholders with a claim on its assets or other income; and
>
> c.  Was not established by, and does not accept contributions from business corporations or labor organizations.

Colo. Sec. of State, Rules Concerning Campaign and Political Finance, Rule 4.13.

We have labeled the exception established by § 3(4)(b) and Rule 4.13 the "*MCFL*

exemption."

A corporation that meets these criteria may use its general corporate

treasuries to make expenditures, contributions, and electioneering

communications.  However, the Secretary maintains that whether or not a

corporation meets the *MCFL* exemption, it must still register as a political

committee if it makes or accepts contributions or expenditures in excess of $200 to

support or oppose the nomination or election of candidates.  Colo. Const. art.

XXVIII, § 2(12)(a) (defining "political committee" as "any person, other than a

natural person, or any group of two or more persons, including natural persons that

have accepted or made contributions or expenditures in excess of $200 to support

or oppose the nomination or election of one or more candidates"); *see id.* § 7

6

(referring to disclosure requirements relevant to political committees and other groups, set forth in Colo. Rev. Stat. § 1-45-108 or any successor section).

Furthermore, if a nonprofit ideological corporation (or "any person") funds electioneering communications exceeding $1,000 per year from its general corporate treasuries, it too must file applicable reports. Section 6(1) of Article XXVIII details these requirements, while § 6(2) prohibits corporate funding of electioneering communications:

> Any person who expends one thousand dollars or more per calendar year on electioneering communications shall submit reports to the secretary of state in accordance with the schedule currently set forth in [Colo. Rev. Stat. §] 1-45-108(2) . . ., or any successor section. Such reports shall include spending on such electioneering communications, and the name, and address, of any person that contributes more than two hundred and fifty dollars per year to such person described in this section for an electioneering communication. In the case where the person is a natural person, such reports shall also include the occupation and employer of such natural person. The last such report shall be filed thirty days after the applicable election.

> Notwithstanding any section to the contrary, it shall be unlawful for a corporation or labor organization to provide funding for an electioneering communication; except that any political committee or small donor committee established by such corporation or labor organization may provide funding for an electioneering communication.

Colo. Const. art. XXVIII, § 6.

At issue here is whether CRLC is subject to Article XXVIII's reporting requirements and whether §§ 3(4) (banning corporations from making expenditures that expressly advocate the election or defeat of a candidate), 6(2) (banning corporations from funding electioneering communications), and (2)(12)

(defining political committee) of Article XXVIII are unconstitutional as applied to CRLC. We also discuss CRLC's contention that these provisions, along with § 2(7), are facially vague and overbroad.

**B. Colorado Right to Life Committee**

We first summarize the undisputed facts regarding CRLC, drawn largely from the district court's order. *See Colo. Right to Life Comm., Inc. v. Davidson*, 395 F. Supp. 2d 1001, 1007-09 (D. Colo. 2005). CRLC is a tax-exempt organization under 26 U.S.C. § 501(c)(4) and has a policy of not contributing to, accepting contributions from, or engaging in express advocacy regarding, political parties or candidates. Likewise, it is not associated with any political candidate, political party, or campaign committee, and is not aware of ever receiving any donations at the request of, or solicited by, a political candidate, a political party or elected official. It has several chapters throughout the State of Colorado. CRLC's policy is not to engage in express advocacy or make direct in-kind contributions.

CRLC's corporate organizational documents indicate that its purposes are to (1) promote reverence and respect for human life without regard to condition, quality, age, race, religion, creed, or color, whether born or unborn; and (2) educate the community regarding the dangers of abortion, euthanasia, infanticide, and compulsory sterilization as well as any legislation that would allow the debasement of or destroy the community's moral fiber; and (3) encourage a

8

favorable, spiritual, physical, and cultural environment that would improve the quality of life consistent with these purposes. CRLC seeks to achieve these purposes by communicating with the public regarding such issues, providing information about elected officials, and encouraging Colorado citizens to communicate with their representatives on these issues.

CRLC was not established by a business corporation or labor union, and has no shareholders or otherwise affiliated persons who would have a claim on its assets and earnings. CRLC has two types of members: (1) supporting members, who include anyone who donates money to the organization, unless that person asks not to be a member; and (2) voting members, who include anyone who supports CRLC's objectives, indicates a desire to join CRLC, and pays the prescribed dues, unless CRLC's board has waived those dues.

Individual donors nearly exclusively fund CRLC through their paying of dues. In 2001, CRLC had 1,529 donors, including 15 who gave $200 or more. In 2002, CRLC had 2,101 donors, including 19 who gave $200 or more. In 2003, CRLC had 1,333 donors, including 7 who gave $200 or more.

CRLC does not have a policy against accepting contributions from business corporations, and it received $50 in corporate contributions in each of 2001, 2002, and 2003. Its gross revenues and receipts from membership dues for the same years were $121,000, $132,000, and $128,000. Additionally, CRLC at one point participated in a long distance telephone service carrier program in which

9

subscribers could designate it as the recipient of a portion of their bills.[4]  In 2003, CRLC received $358.30 from its participation in this program.

CRLC also engages in fund-raising activities including the "sale" (via suggested donations) of "baby feet pins" and bumper stickers at various public events like the Colorado State Fair.  Although there is a suggested donation for the items, they are often given away.  CRLC's treasurer estimated that CRLC received approximately $300 per year from these combined activities. Additionally, about a decade ago, CRLC received income when it rented its mailing list to a political candidate for a state house seat.

CRLC has not had a political committee or other segregated account since 1986.  It has no record of ever receiving donations earmarked for the type of communications at issue in this case.

CRLC publishes a periodic newsletter, titled *The Colorado LifeLight*, which often mentions the names of candidates and their positions on various life issues.  CRLC distributes *The Colorado LifeLight* year-round, including within 30 days before the primary election and 60 days before the general election.  The newsletter is sent to members, and sometimes to prospective members.  In total, the mailing is sent to approximately 3,000 to 3,500 recipients.

CRLC also maintains a website that contains a section on politics and law.

---

[4] The record indicates that in 2005, CRLC had a similar program with a company called Amerivision.

Some articles in that section mention candidates and are available to the public year round, including immediately preceding elections. Additionally, CRLC admits that it "might" have placed voter guides on its website in the past.

In recent election cycles, CRLC has made communications that unambiguously referred to candidates within 30 days before primary elections and 60 days before general elections to inform voters of the candidates' views on abortion. CRLC spent over $1,000 per year on these communications, which have included voter guides, articles on its website, radio ads, pre-recorded phone messages, direct-mail, and email. Some examples include:

• In July 2000, CRLC sent "Rapid Response Cards," which provided the responses of primary candidates in five districts to a CRLC survey regarding life-related issues, to individuals from those five districts in its mailing list database. In its September newsletter, CRLC noted that all five pro-life candidates had won and expressed confidence that "the cards had an impact" on the election results. CRLC spent $200 on this effort.

• Before the primaries and general elections in 2000, CRLC circulated the results of its 2000 Candidate Questionnaire, which provided the responses of some candidates to a variety of abortion and related issues.

• In August 2002, before the state primary election, CRLC arranged for a pre-recorded phone call to be made to identified pro-life supporters in Morgan County before a primary election in which Jack Darnell and Greg Brophy were running. The message compared the views of the two candidates on abortion, and asked the recipients to urge Mr. Darnell to "abandon his pro-abortion views" and to "thank" Mr. Brophy for defending unborn children. CRLC spent $335 on this activity.

• In August 2002, CRLC, in partnership with the Christian Coalition, sent a form letter to registered pro-life voters in House District 55 comparing the two candidates views on abortion. This letter asked

11

recipients, when voting in the election, to help stop Gayle Berry's "extreme pro-abortion agenda," as well as urging recipients to "thank" Shari Bjorglund for being "solidly pro-life." CRLC spent $207 on this letter.

• In August 2002, CRLC published *The Colorado LifeLight*, with a subtitle "Special Report – 2002 Voter Guide." Although the front page was devoted to general information, the remainder of the publication reported the responses of 42 candidates for state or federal office to a CRLC questionnaire. In the October/November 2002 *Colorado LifeLight*, CRLC urged recipients to vote no on three ballot measures and published a list of Colorado candidates who had been endorsed by the National Abortion Rights Action League.

• In the 2002 general election, CRLC ran radio ads on Denver and Longmont stations comparing the partial-birth abortion views of Fourth Congressional District candidates State Senator Stan Matsunaka and Marilyn Musgrave. Around that same time, CRLC also ran other radio ads encouraging people in Sen. Matsunaka's district to call him and ask him to pass the Born Alive Infant Protection Act out of his senate committee.

## C. Procedural Background

Because of Article XXVIII's prohibitions and regulations, CRLC determined it would no longer engage in some of the above activities. CRLC sought declaratory and injunctive relief. The district court reviewed the following five claims:

(1) whether § 3(4)(a)'s ban on corporate contributions and expenditures is unconstitutional as applied to CRLC because it is a non-profit ideological corporation that does not engage in business activities and receives only insubstantial or de minimis contributions from business corporations;

(2) whether § 6(2)'s ban on direct corporate funding for electioneering and communications is unconstitutional as applied to CRLC, for the same reason that § 3(4)(a)'s ban is unconstitutional as applied to CRLC;

12

(3) whether § 2(12)'s definition of "political committee" is unconstitutional on its face and as applied to organizations such as CRLC that do not have a major purpose of electing candidates;

(4) whether §§ 6 and 2(7), dealing with "electioneering communications" are impermissibly vague and overbroad and cannot be constitutionally applied to CRLC's communications not directly or indirectly advocating the election or defeat of any candidate; and

(5) whether § 3(4)(a)'s ban on corporate expenditures is unconstitutional because it is vague and overbroad.

Both parties sought summary judgment. The district court ruled "as narrowly as possible," and addressed CRLC's as-applied challenges first. 395 F. Supp. 2d at 1010. The district court granted each motion in part, determining that Article XXVIII §§ 3(4) (banning corporations from making expenditures that expressly advocate the election or defeat of a candidate) and 6(2) (banning corporations from funding an electioneering communication) were unconstitutional as applied to CRLC because it is exempt from such restrictions under the principles of *MCFL*. The district court also found that § 2(12)'s definition of "political committee" was unconstitutional as applied to CRLC because it failed to include *Buckley*'s "major purpose" test.

The district court rejected, or declined to reach, CRLC's remaining facial challenges. Specifically, it rejected CRLC's vagueness and overbreadth challenges to § 6(1) (outlining reporting requirements for any person who expends more than $1,000 per calendar year on electioneering communications), noting that "[a] statute may not be invalidated simply because some persons' arguably

13

protected conduct may or may not be caught or chilled by the statute." *Id.* (internal quotation marks omitted). Similarly, it rejected CRLC's vagueness challenge to § 2(7)'s definition of "electioneering communications" because "CRLC has not demonstrated that [§ 2(7) is] impermissibly vague in all of its applications." *Id.* at 1017.

The district court declined to reach CRLC's facial challenges to §§ 3(4) (banning corporations from making expenditures that expressly advocate the election or defeat of a candidate), 6(2) (banning corporations from funding an electioneering communication), and § 2(12) (defining political committee) because it had already granted CRLC a narrower remedy when it found these sections unconstitutional as applied to CRLC.

## II. DISCUSSION

The Secretary challenges the district court's grant of summary judgment to CRLC and enjoinment of his enforcement of certain provisions of Article XXVIII against CRLC. Specifically, the Secretary disputes the district court's rulings that (1) § 3(4) (which bans corporations from making expenditures that expressly advocate the election or defeat of a candidate) is unconstitutional as applied to CRLC because CRLC engaged only in de minimis business activities and received only de minimis contributions from business corporations; (2) § 6(2) (which bans corporations from providing funding for electioneering communications) is unconstitutional as applied to CRLC for the same reason; and (3) § 2(12) (defining

14

political committee) is unconstitutional as applied to CRLC for employing a trigger of $200 without consideration of whether the organization's "major purpose" is the nomination or election of candidates as required by *Buckley*. We must reject the Secretary's challenges.

In its cross-appeal, CRLC challenges the facial validity of three sections: §§ 6(2) (banning corporations from funding electioneering communications), 2(7) (defining electioneering communications), and 2(12) (defining political committee).[5] Because we agree with the district court's determination that CRLC is an exempt *MCFL* entity, we need not address CRLC's challenges to §§ 6(2) and 2(7). As to its facial challenge to § 2(12), we agree with the district court that we need not reach this contention.[6]

_____

[5] CRLC also argues that § 3(4)'s prohibition against a corporations making expenditures expressly advocating the election of defeat of a candidate, should be declared unconstitutional both as applied and facially void for vagueness for the additional reason that this section does not satisfy *Buckley*'s express advocacy requirement. Aple's Br. at 46-48. CRLC acknowledges that it did not raise this "express advocacy" as-applied challenge in its complaint. *Id.* at 46-47. We agree with the Secretary that at most CRLC argued before the district court that § 3(4) should be declared facially invalid. The district court declined to address CRLC's facial challenge to this section, having found § 3(4) unconstitutional as applied to CRLC because CRLC was an exempt *MCFL* entity. Because we agree with the district court's approach, and because we generally "decline to consider issues first raised on appeal," we will not address this belated argument. *Sussman v. Patterson*, 108 F.3d 1206, 1210 (10th Cir. 1997).

[6] We must first briefly address the Secretary's threshold argument that CRLC lacks standing to challenge § 2(12), which defines a political committee, because CRLC has not established either a segregated fund or a political committee.

(continued...)

## A. The Secretary's Appeal

We review the district court's grant of summary judgment de novo, applying the same standards used by the district court. *Homans v. City of Albuquerque*, 366 F.3d 900, 903 (10th Cir. 2004). "We also review the district court's findings of

[6](...continued)

Under Article III, standing requires a party to show actual injury, a causal relation between that injury and the challenged conduct, and the likelihood that a favorable decision by the court will redress the alleged injury. *Lujan v. Defenders of the Wildlife*, 504 U.S. 555, 560-61 (1992). Independent campaign expenditures constitute "political expression at the core of our electoral process and of the First Amendment freedoms." *Buckley*, 424 U.S. at 39 (internal quotation marks omitted). The mere fact that CRLC is a corporation does not remove its speech from the protective ambit of the First Amendment. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978) ("The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual."). There is no doubt that requiring corporations to make independent expenditures only through segregated funds, such as political or donor committees, burdens corporate freedom of expression. *MCFL*, 479 U.S. at 252. Here, in addition to disclosure requirements, the statute provides various penalties, *see* Colo. Const. art. XXVIII, § 10, and at no point in this litigation has the Secretary suggested that he will not seek enforcement of these penalties.

Because the Secretary has indicated unequivocally his intent to prosecute CRLC, CRLC has suffered the constitutionally sufficient injury of self-censorship through the chilling of protected First Amendment activity, rendering its as-applied challenge to § 2(12), and, for that matter, its other challenges to Article XXVIII, justiciable. CRLC also suffers Article III injury when it must either make significant changes to its operations to obey the regulation, or risk an investigation and citation. The Secretary rightfully does not challenge the CRLC's standing on other grounds, and we hold that CRLC has standing to challenge portions of Article XXVIII because it undisputedly meets the causation and redressibility prongs of the standing test.

Accordingly, because the challenged sections of Article XXVIII infringe on First Amendment rights, the Secretary bears the burden of proving they are constitutional as applied to CRLC.

constitutional fact in a First Amendment claim and conclusions of law de novo. Because this decision implicates First Amendment freedoms, we perform an independent examination of the whole record in order to ensure that the judgment protects the rights of free expression." *Faustin v. City & County of Denver*, 423 F.3d 1192, 1195-96 (10th Cir. 2005) (internal citation omitted).

Plaintiffs may bring two types of First Amendment challenges to a government's policy, facial and as-applied. A facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case. Like the district court, we consider the disposition of CRLC's as-applied challenges first, and then turn to its facial challenges below, in section II.B.

In an as-applied challenge in the context of campaign finance laws, "limits on political expenditures deserve closer scrutiny than restrictions on political contributions." *FEC v. Colo. Republican Fed'l Campaign Comm.*, 533 U.S. 431, 440 (2001); *see FEC v. Wisc. Right to Life, Inc.*, 127 S. Ct. 2652, 2664 (2007) ("*WRTL*") ("Because [the statute] burdens political speech, it is subject to strict scrutiny."); *Buckley v. American Const'l Law Found., Inc.*, 525 U.S. 182, 207 (1999) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."). The parties do not dispute that this case involves Article XXVIII's restrictions on

17

political expenditures,[7] and that political expenditures are subject to strict scrutiny. *Homans*, 366 F.3d at 906 (concluding "the standard for expenditure limits operates identically to strict scrutiny review"). Hence, "to be upheld, . . . the campaign-expenditure restrictions must be both narrowly tailored and necessary to serve a compelling state interest." *Id.* (internal citations omitted); *see WRTL*, 127 S. Ct. at 2664.

> 1. As-applied challenge to Article XXVIII §§ 3(4) (banning corporations from making expenditures that expressly advocate the election or defeat of a candidate) and 6(2) (banning corporations from funding an electioneering communication)

The district court concluded that CRLC is exempt from both § 3(4)'s ban on corporate expenditures that expressly advocate the election or defeat of a candidate and § 6(2)'s ban on a corporation's funding of electioneering communication because CRLC receives only de minimis contributions from business corporations. The Secretary argues that *any* business contribution

---

[7] In his opening brief, the Secretary insists that CRLC must establish, in its as-applied challenges, that the state law is unconstitutional as applied to it beyond a reasonable doubt. The Secretary's propositions are accurate, except in the instance of a law, like Article XXVIII, that might "infringe[] on the exercise of First Amendment rights." *Ass'n of Cmty. Orgs. for Reform Now v. Municipality of Golden*, 744 F.2d 739, 744 (10th Cir. 1984). The Secretary reluctantly concedes this point in his reply brief, and acknowledges that in such a case, as here, "its *proponent* bears the burden of establishing its constitutionality." *Id.* (emphasis supplied); *WRTL*, 127 S. Ct. at 2664 ("Under strict scrutiny, the *Government* must prove that applying [the statute] to [the organization's] ads furthers a compelling interest and is narrowly tailored to achieve that interest"). We appreciate the Secretary's candor, even if a bit belated.

18

forecloses exemption from §§ 3(4) and 6(2).

a. *MCFL* exemption

In *MCFL*, the Federal Election Commission ("FEC") charged MCFL, a nonprofit membership corporation created to oppose abortion rights, with violating the Federal Election Campaign Act of 1971 ("FECA"), 86 Stat. 11, as amended, 2 U.S.C. § 441b, by distributing a voter guide in the 1978 congressional election. 479 U.S. at 244-45. When MCFL refused to pay a fine, the FEC sued. MCFL claimed FECA abridged its First Amendment rights, and the Supreme Court agreed. The Court first reiterated that independent expenditures could not be regulated as strictly as contributions. *Id.* at 259-60. Independent expenditures are similar to pure issue discussion and therefore remain far removed from the valid state interest of preventing election corruption. *Id.*

The Court also held that FECA could be applied to business corporations and other entities that presented some danger of "unfair deployment of wealth for political purposes." *Id.* at 259. "Direct corporate spending on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace." *Id.* at 258. The Court observed that the concerns motivating prohibition of corporate political spending were absent in regard to MCFL, however, because "[v]oluntary political associations do not suddenly present the specter of corruption merely by assuming the corporate form." *Id.* at 263. In delineating this exemption, the Court cited

19

three "essential" features of *MCFL*:

> (1) the entity was formed for the purpose of promoting political ideas, and did not engage in business activities;

> (2) it had no shareholders or others with a claim to its assets or earnings; and

> (3) it was not formed by a corporation, and had a policy against accepting corporate contributions.

*Id.* at 263-64.

As noted above, Colorado's campaign finance amendment includes an exemption for such corporations. *See* Colo. Const. art. XXVIII, § 3(4)(b). Although the prohibition on corporate funding of electioneering communications does not explicitly contain the same exemption, the Secretary promulgated Rule 4.13, which construes § 6(2) to exclude *MCFL* corporations.

The parties do not dispute that CRLC satisfies the second prong. Although the Secretary does not concede that CRLC has satisfied the first prong,[8] he focuses

---

[8] Specifically, the Secretary notes that CRLC "does not have a policy against engaging in business activities and on occasion has sold its telephone list." Aplt's Br. at 28. The Secretary also states that CRLC "has generated a small income stream by selling its mailing list." CRLC clarifies that this "sale" was a one-time rental of its mailing (and not telephone) list for a small unspecified amount. *Id.* at 10; Aple's Br. at 3. The Secretary does not dispute that this isolated transaction generated minimal income. We hold that this activity does not suggest CRLC engages in business activities. *See Day v. Holahan*, 34 F.3d 1356, 1364 (8th Cir. 1994) (rejecting state's argument concerning a putative *MCFL* nonprofit corporation's business activities that included the regular rental of mailing list and selling of advertisements in its newsletter that generated minimal income).

Similarly, CRLC's minimal sales of "baby feet" pins and bumper stickers

(continued...)

his arguments on appeal on the third *MCFL* prong. It is the third prong that poses the rub: CRLC admits that it does not have a policy against accepting contributions, and that it has accepted contributions—in the amount of about $50 per year. In response, the Secretary "argues that because the *MCFL* Court deemed the characteristics 'essential,' the Court created a bright line allowing the government to regulate the political expenditures of any corporation as long as it does not share the precise *MCFL* characteristics." 395 F. Supp. 2d. at 1012. The district court refused to adopt the Secretary's unbending argument that "Colorado may prohibit direct political expenditures by an advocacy corporation such as CRLC if it accepts *de minimis* corporate contributions." *Id.*

The Secretary acknowledges that § 3(4)(b) and Rule 4.13 comport with *MCFL*. But, he argues that by allowing an exception for de minimis corporations, the district court diverts the analysis to a review of a corporation's day-to-day actions. As a practical matter, "[t]he courts and the public do not have the resources to conduct such reviews." Aplt's Br. at 27. Because "[e]ven minimal expenditures can have a significant impact," the Secretary argues that the district

---

[8](...continued)
do not preclude it from qualifying as an *MCFL*-exempt corporation. Such activities cannot be classified as "business activities." *See MCFL*, 479 U.S. at 263 ("If political fundraising events are expressly denominated as requests for contributions that will be used for political purposes, . . . these events cannot be considered business activities."). Indeed, MCFL itself engaged in various fundraising activities such as garage sales, bake sales, dances, raffles, and picnics. *See id.* at 242.

court's approach is impractical and invites corruption. *Id.*

We disagree with the Secretary's analysis for substantially the same reasons as the district court. The district court relied in part on the reasoning of every other circuit to have addressed this issue, noting that if corporate contributions made up a minimal part of an organization's revenue, the *MCFL* exemption applies. *See FEC v. Nat'l Rifle Ass'n*, 254 F.3d 173, 192 (D.C. Cir. 2001) (holding that sponsorship of non-political activities, provision of non-political goods and services such as magazines and accident insurance to members, lack of policy against corporate contributions, and actual receipt of up to $1,000 in corporate contributions did not turn an incorporated advocacy group "into a potential conduit for corporate funding of political activity"); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 714 (4th Cir. 1999) (lack of policy against corporate donations and receipt of up to a "modest percentage [8%] of revenue" from corporations did not prevent corporation from claiming *MCFL* exemption); *FEC v. Survival Educ. Fund, Inc.*, 65 F.3d 285, 293 (2d Cir. 1995) (stating that "a nonprofit political advocacy corporation, which in fact receives no significant funding from unions or business corporations, does not surrender its First Amendment freedoms for the want of such a policy" and holding that lack of policy against corporate contributions and actual receipt of up to 1% of funds from corporations did not place group outside scope of *MCFL* exemption); *Day v. Holahan*, 34 F.3d 1356, 1363-65 (8th Cir. 1994) (holding that the lack of policy

22

against corporate donations and engaging in "incidental" business activities did not put group outside *MCFL* exemption).

We agree with these courts that *MCFL* does not establish an immobile set of parameters. *See, e.g.*, *Day*, 34 F.3d at 1367 ("The state goes too far in concluding that the factual findings of *MCFL* translate into absolutes in legal application."). Instead, they are really factors to determine whether a corporation is more like the "type of traditional corporatio[n] organized for economic gain," or the voluntary political association of *MCFL*. *MCFL*, 479 U.S. at 259 (internal quotation marks omitted); *see id.* at 263 ("Some corporations have features more akin to voluntary political associations than business firms, and therefore should not have to bear burdens on independent spending solely because of their incorporated status.").

As previously noted, CRLC receives approximately $50 of corporate funding per year. This figure, "[b]oth as a percentage of its gross income (significantly less than 1%) and an absolute number, . . . could not "'have turned [CRLC] into a potential conduit for corporate funding of political activity.'" 395 F. Supp. 2d. at 1014 (quoting *Nat'l Rifle Ass'n*, 254 F.3d at 192).

b. Post-*MCFL* Supreme Court decisions

In response to the district court's analysis, the Secretary suggests that the four circuits that have applied the *MCFL* exemption have misconstrued the Court's decision. Recognizing that every circuit that has addressed the issue has allowed for incidental or de minimis corporate contributions, the Secretary argues that

23

Supreme Court precedent dictates we should apply the MCFL exemption only sparingly, citing *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), *FEC v. Beaumont*, 539 U.S. 146 (2003), and *McConnell v. FEC*, 540 U.S. 93 (2003). After reviewing these cases, we conclude that the Secretary's arguments are unpersuasive.

(i) *Austin v. Michigan Chamber of Commerce*

In *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), the Supreme Court revisited the *MCFL* exemption when it addressed the Michigan Chamber of Commerce's (the "Chamber's") as-applied challenge to Michigan's Campaign Finance Act. *Id*. at 655. Initially, the Supreme Court rejected a facial overbreadth challenge to the law on the grounds that it regulated "closely held corporations that do not possess vast reservoirs of capital." *Id*. at 661. The Court determined that although some closely held corporations may not have accumulated significant amounts of wealth, "they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process," which justified the law's general applicability. *Id*.

Additionally, the Court held that although the Chamber was a non-profit ideological corporation, it did not qualify as an *MCFL* corporation under the three factors. *Id*. at 662. First, the Court held that although the Chamber engaged in political activities, its primary purposes involved business and economic issues in

24

contrast to MCFL's primary political purpose. *Id*. Second, the Court observed that:

> Although the Chamber also lacks shareholders, many of its members may be similarly reluctant to withdraw as members even if they disagree with the Chamber's political expression, because they wish to benefit from the Chamber's nonpolitical programs and to establish contacts with other members of the business community.

*Id*. at 663.

Accordingly, the Court found that the Chamber's "members are more similar to shareholders of a business corporation than to members of *MCFL*." *Id*. Finally, the Court remarked that "more than three-quarters of the Chamber's members are business corporations, whose political contributions and expenditures can constitutionally be regulated by the State." *Id*. at 664. Consequently, recognizing the Chamber as an *MCFL* corporation would circumvent the purpose of Michigan's campaign finance law.

The Secretary suggests that *Austin* supports his theory that the Court intends a bright constitutional line to exist between *MCFL* and non-*MCFL* entities. In fact, the Court's analysis suggests that the Chamber's challenge to Michigan's law failed because it was closer to a traditional corporation than a voluntary political association. Given CRLC's close resemblance to a voluntary political association, much like the one at issue in *MCFL*, we agree with the district court that CRLC's acceptance of de minimis contributions does not transform it into a "potential conduit for corporate funding of political activity." 395 F. Supp. 2d. at 1014

25

(quoting *Nat'l Rifle Ass'n*, 254 F.3d at 192).

(ii) *FEC v. Beaumont*

In *Beaumont*, the plaintiff was an officer of North Carolina Right to Life, Inc. ("NCRL"), a not-for-profit corporation organized under North Carolina law. NCRL's funding came almost entirely from donations from individual members, but it also accepted a small amount in corporate donations. NCRL used its general treasury funds to make both independent expenditures and *contributions* to candidates for state office, as allowed by North Carolina law. NCRL challenged the federal prohibition on contributions from its treasury to candidates for federal office.

NCRL, like CRLC, based its challenge on *MCFL*, contending that as an *MCFL* entity, NCRL had a constitutionally protected right to make contributions to candidates. The Fourth Circuit agreed, holding that contributions by such a group, like independent expenditures, fell within the *MCFL* exemption to prohibitions on corporate activity.

The Supreme Court reversed, noting that the case was correctly characterized as a contributions, rather than an expenditures, case, and thus subject to reduced scrutiny. The Court admonished that advocacy corporations may also raise corruption concerns, as they too "benefit from significant state-created advantages." *Beaumont*, 539 U.S. at 159-60 (internal quotation marks omitted). The Court asserted that "[n]on-profit advocacy corporations are,

26

moreover, *no less susceptible than traditional business companies to misuse as conduits* for circumventing the contribution limits imposed on individuals." *Id.* (emphasis supplied).

The district court here rejected the Secretary's reliance on *Beaumont* because the case focuses on *contributions*, not *expenditures*, and is thus not analogous. *Cf. Beaumont*, 539 U.S. at 164 (Kennedy, J., concurring) (*MCFL* "contains language supporting the Court's holding here that corporate *contributions* can be regulated more closely than corporate expenditures.") (emphasis supplied). Because we focus on Article XXVIII's restrictions on expenditures, we agree with this distinction, and reject the Secretary's argument on appeal.

### (iii) *McConnell v. FEC*

Third and finally, the Secretary and Amici Curiae Colorado Common Cause and the League of Women Voters of Colorado, turn to *McConnell* for support of a bright-line application of *MCFL*. They focus specifically on the *McConnell* Court's statement that "[o]ur decision in *MCFL* related to a carefully defined category of entities." 540 U.S. at 210. Standing alone, we acknowledge this language limits the breadth of *MCFL* factors; however, the *McConnell* Court also distinguished the case before it from *MCFL*:

> MCFL was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities. *This prevents such corporations from serving as conduits for the type of*

27

*direct spending that creates a threat to the political marketplace*."

*Id.* at 211 (quotation marks omitted) (emphasis supplied).

The district court applied the same analysis. It noted that CRLC closely resembled MCFL's plaintiff: "both are nonprofit, non-stock corporations sharing very similar purposes, advocacy activities, and funding mechanisms, including voluntary donations from members and informal fund-raising sales such as bake sales, in the case of *MCFL*, or baby-feet pin sales in the case of CRLC." 395 F. Supp. 2d at 1014. The notable difference between the two is that CRLC receives about $50 of corporate funding per year.[9] This amount represents less than one percent of CRLC's gross income and does not invite the creation of a political conduit for corporate funding of political activity.[10] We agree with the district

---

[9] We note that in *WRTL*, the Court chose not to "pass on [an] argument" that WRTL was a nonprofit advocacy group eligible for the *MCFL* exemption "because WRTL's funds for its ads were not derived solely from individual contributions." 127 S. Ct. at 2673 n.10. The *WRTL* dissent notes that WRTL was unable to take advantage of the *MCFL* exemption because it "chose[] to serve as a funnel for hundreds of thousands of dollars from other corporations." *Id.* at 2703 (Souter, J., dissenting). Without more, we cannot hold that *WRTL* impacts our holding that CRLC's receipt of de minimis business contributions forecloses application of the *MCFL* exemption to it.

[10] We further note that the amounts of money CRLC received from its participation in Life-Line and similar programs do not qualify as corporate contributions relevant to the *MCFL* exemption. This program allowed subscribers to donate a percentage of their phone bill payment to a nonprofit organization of their choosing. In 2003, CRLC received a total of $358.30 from this program. As the Fourth Circuit (and the district court in this case) observed, "while these contributions may technically come from the phone company, they in fact result from the decisions of individual phone company customers." *Bartlett*, 168 F.3d at
(continued...)

28

court that the Secretary "has not demonstrated that [§] 6(2)'s infringement upon CRLC's protected speech is supported by a compelling justification. . . . For the same reasons, [§] 3(4)(a), to the extent it proscribes a corporation from making 'expenditures expressly advocating the election or defeat of a candidate' except through a committee, is unconstitutional as applied to CRLC." *Id.* at 1014-15.

2. As-applied challenge to Article XXVIII § 2(12)'s definition of "political committee"

The Secretary next challenges the district court's grant of summary judgment to and enjoinment of his enforcement of § 2(12) against CRLC. Section 2(12)(a) defines political committee as "any person, other than a natural person, or any group of two or more persons, including natural persons that have accepted or made contributions or expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates." Colo. Const. art. XXVIII, § 2(12)(a). The district court struck down § 2(12) as applied to CRLC. The district court stated that "*Buckley* establishes that regulation should be tied to groups controlled by candidates or which have a 'major purpose' of electing candidates." 395 F. Supp. 2d at 1020. Because "[i]t [was] not clear whether the facts presented

---

[10](...continued)
714. Accordingly, participation in such a program does not implicate the same concerns regarding the potential for distorting the political process as direct corporate contributions do. We also agree with the district court's observation that "even if they were corporate contributions, they are likewise *de minimis*," because they would raise CRLC's total corporate contributions to "approximately $400, or approximately .3% of its total revenues." 395 F. Supp. 2d at 1014, n.10.

would expose CRLC to 'political committee regulation,'" the district court assumed that they did and ruled on an as-applied basis. *Id.* at 1020 n.22.

Here, the Secretary argues he can regulate an entity even if it does not have *Buckley*'s "major purpose" of nominating, electing, or defeating a candidate. Should this court disagree with the Secretary's proposed broad regulatory powers, he urges us to construe § 2(12) as incorporating the "major purpose" test, thus still requiring disclosure.

> a. Federal regulation of political committees: *Buckley*'s "major purpose" test

Regulation of "political committees" by campaign finance law began with the passage of FECA. According to FECA, a "political committee" is any group that receives "contributions" or makes "expenditures" exceeding $1,000 per year. 2 U.S.C. § 431(4). A "contribution" or "expenditure" is any gift or payment made "for the purpose of influencing any election for Federal office." *Id.* § 431(8)(A)(i), (9)(A)(i).

The Supreme Court later added in *Buckley*, that a group is not a "political committee" unless its "major purpose" is to influence federal elections. 424 U.S. at 79. The Court explained that:

> The general requirement that "political committees" and candidates disclose their expenditures *could raise similar vagueness problems*, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. The lower courts have construed the words "political committee" more narrowly. To fulfill the

30

purposes of [FECA] *they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate.* Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Id.* (footnotes omitted) (emphasis supplied). This construction of the term political committee as applied to non-candidate organizations has come to be known as the "major purpose" test. *See FEC v. Akins,* 524 U.S. 11, 29 (1998) (considering whether certain of organization's expenditures were membership communications in connection with application of the "'major purpose'" test).

In *MCFL*, the Court suggested two methods to determine an organization's "major purpose": (1) examination of the organization's central organizational purpose; or (2) comparison of the organization's independent spending with overall spending to determine whether the preponderance of expenditures are for express advocacy or contributions to candidates. 479 U.S. at 252 n.6 (noting that MCFL's "central organizational purpose [wa]s issue advocacy, although it occasionally engage[d] in activities on behalf of political candidates"); *see id.* at 262 (noting that "should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee"). Thus, under FECA, any group that (1) spends more than $1,000 in a year, and (2) has as its "major purpose" the influencing of a federal election, should be considered a political committee.

31

As a political committee, the group must adhere to certain registration, organizational, recordkeeping, reporting, and disclosure requirements. *See MCFL*, 479 U.S. at 254 ("[M]ore extensive requirements and more stringent restrictions . . . may create a disincentive for such organizations to engage in political speech.").

b. Colorado's regulation of political committees

Under Colorado's definition of political committees, any group that spends more than $200 a year to support or oppose the nomination or election of one or more candidates is subject to the State's various administrative, organizational, and reporting requirements. In concluding that § 2(12) was unconstitutional as applied to CRLC, the district court noted that the $200 trigger, standing alone, is incompatible with a "major purpose" test: "[T]he amount of money an organization must accept or spend–$200–is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets." 395 F. Supp. 2d at 1021. The court added that, under § 2(12)(a), "an entity that spends $200,000 on various non-political activities and donates $200 (1/10 of 1% of its budget) to a candidate is deemed a political committee." *Id*.

The Secretary first argues the district court erred when it determined § 2(12) was unconstitutional as-applied to CRLC and that its "reasoning [was] based upon the flawed assumption that the major purpose component is constitutionally compelled by *Buckley* . . . ." Aplt's Br. at 31. The Secretary also suggests that

32

*McConnell* somehow reevaluated *Buckley*. The Secretary avers without much explanation, that, "[a]s with the distinction between express advocacy and issue advocacy, the incorporation of a major purpose test into the definition of political committee 'was an endpoint of [statutory] interpretation, not a first principle of constitutional law.'" Aplt's Br. at 31-32 (quoting *McConnell*, 540 U.S. at 190).

Because the distinction between issue advocacy and express advocacy is not constitutionally compelled, he argues, there is also no required inclusion of the "major purpose" test. "In other words, it is the 'major purpose' of *the expenditure* and not the 'major purpose' of the organization that is constitutionally significant." Aplt's Reply Br. at 23 (emphasis supplied). Thus, the Secretary seems to suggest that the $200 trigger satisfied the major purpose test.

We cannot agree with the Secretary's broad propositions.[11] First, there is little question that *Buckley*'s "major purpose test" is left unaltered in the wake of *McConnell*. *See Political Committee Status, Definition of Contribution, and*

---

[11] In fact, the Supreme Court recently made clear in *WRTL* that the distinction between issue advocacy and express advocacy can be paramount in the context of electioneering communications: "a court should find that [advocacy] is the functional equivalent of express advocacy only if the [advocacy] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667. Again referring to electioneering communications, the Court also "decline[d] to adopt a test for as-applied challenges turning on the speaker's intent to affect an election." *Id.* at 2665. The Court reiterated the difficulties of regulating issue advocacy in electioneering communications: if the regulated advocacy was "*not* express advocacy or its equivalent, the Government's task is . . . formidable. It must then demonstrate that [the regulation] is narrowly tailored to serve a compelling interest." *Id.* at 2664.

33

*Allocation for Separate Segregated Funds and Nonconnected Committees*, 69 Fed. Reg. 68,056, 68,065 (Nov. 23, 2004) ("[N]o change through regulation of the definition of 'political committee' is mandated by [the Bipartisan Campaign Reform Act, ("BCRA")] or the Supreme Court's decision in *McConnell.* The 'major purpose' test is a judicial construct that limits the reach of the statutory triggers in FECA for political committee status. The Commission has been applying this construct for many years without additional regulatory definitions, and *it will continue to do so in the future.*") (emphasis added); *N.C. Right to Life, Inc. v. Leake*, 482 F. Supp. 2d 686, 692 (E.D.N.C. 2007) ("In *McConnell*, [reviewing BCRA] the major purpose test was not directly examined. Thus, the Court in *McConnell* did not overturn or criticize the major purpose test, and its authority remains in force."); *see also* Trevor Potter, *McConnell v. FEC Jurisprudence and its Future Impact on Campaign Finance*, 60 U. MIAMI L. REV. 185, 198 (2006) ("[T]he [*McConnell* Court] implicitly affirmed the continuing applicability of the 'major purpose' test when it referred to the 'major purpose' language in the *Buckley* opinion.") (citing *McConnell*, 540 U.S. at 170 n.64 (quoting *Buckley*, 424 U.S. at 79)). Hence, we hold that Colorado's "interest in disclosure . . . can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee. . . ." *MCFL*, 479 U.S. at 262.

Second, for substantially the same reasons as the district court, we agree that

the $200 trigger, standing alone, cannot serve as a proxy for the "major purpose" test as applied to CRLC: "[T]he amount of money an organization must accept or spend–$200–is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets." 395 F. Supp. 2d at 1021. The court added that, under § 2(12)(a), "an entity that spends $200,000 on various non-political activities and donates $200 (1/10 of 1% of its budget) to a candidate is deemed a political committee." *Id*. Section 2(12), as written, is thus unconstitutional as applied to CRLC.

c. Narrowing construction

The Secretary maintains that if we hold that the "major purpose" test survives *McConnell*, then § 2(12)'s definition of political committee as applied to CRLC is readily susceptible to a narrowing construction that will remedy any constitutional infirmity presented by the omission of the "major purpose" test. *See* Aplt's Br. at 39 (citing *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000)). He avers that because Colorado's definition of political committee is substantially similar to the federal definition, and Colorado "has used federal campaign law as a template for its campaign laws," § 2(12) should withstand constitutional scrutiny. *Id.* at 39.

Generally, we consider the application of a narrowing construction in the context of a facial challenge. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S.

35

383, 397 (1988) ("It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld."); *Citizens for Responsible Gov't State Political Action Comm*, 236 F.3d at 1194. As we later discuss, we decline to reach CRLC's facial challenge to § 2(12). However, regardless of whether we characterize the Secretary's argument as addressing a facial or as-applied challenge, we agree with the district court that the statute does not lend itself to a narrowing construction.

To be readily susceptible to a narrowing construction, such a construction must be "reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (internal quotation marks omitted). "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Thus, "we will not rewrite a state law to conform it to constitutional requirements." *Am. Booksellers Ass'n*, 484 U.S. at 397.

Here, importantly, we note that Article XXVIII's definition of "issue committee" includes the very "major purpose" test at issue, suggesting that the legislature was well aware of *Buckley*'s requirements when it drafted Article XXVIII. *See id.* § 2(10)(a) ("'Issue committee' means any person, other than a

36

natural person, or any group of two or more persons, including natural persons . . .

[t]hat has a major purpose of supporting or opposing any ballot issue or ballot

question . . . .").  The inclusion of the "major purpose" test in § 2(10)(a) indicates

that the decision *not* to include this requirement in the definition of political

committee was deliberate and consistent with the state citizenry's intent.  Because

we cannot re-write state laws to conform with constitutional requirements where

doing so would be inconsistent with legislative, or here, the state citizenry's intent,

we hold that the district court properly concluded that § 2(12) as applied to CRLC

could not saved by incorporating a narrowing construction.  *See Bartlett*, 168 F.3d

712-13 (4th Cir. 1999) (striking down North Carolina campaign finance statute as

facially vague and overbroad, noting that the court was unable to excise the word

"incidental" from a statute because "[t]o accept [North Carolina's] proffered

interpretation would read the references to influencing elections (a classic form of

issue advocacy) right out of the statute").

**B. CRLC's Cross-Appeal**

In its cross-appeal, CRLC challenges three sections of Article XXVIII: §§

6(2), 2(7), and 2(12).  First, it argues in the alternative, that if we reverse the

district court's decision that CRLC is an *MCFL* entity, then we must address its

facial overbreadth and vagueness challenges to §§ 6(2) and 2(7).[12]  However,

---

[12]  We reiterate that a party should not take a cross-appeal when it succeeds
below.  *Leprino Foods. Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1290 (10th
(continued...)

37

because we hold that CRLC meets the *MCFL* exemption requirements, we need not address this argument.

Next, it asks us to consider whether § 2(12)'s definition of political committee, which the district court declared unconstitutional as applied to CRLC, is also facially unconstitutional. "Facial challenges seek to vindicate not only individual plaintiffs' rights but also those of all others who wish to engage in the speech being prohibited." *Faustin*, 423 F.3d at 1196.

To succeed, CRLC must establish that the law, in *every* application, "creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129-30 (1992) (internal citations omitted); *Faustin*, 423 F.3d at 1199 ("The overbreadth claimant bears the burden of demonstrating from the text of the law and from actual fact, that substantial overbreadth exists."). This task presents a "heavy burden" for the plaintiff. *McConnell*, 540 U.S. at 207.

Here, the district court determined it need not address CRLC's facial challenge to § 2(12). We agree with the general proposition that a court should "never . . . formulate a rule of constitutional law broader than is required by the

[12](...continued)
Cir. 2006) ("Only a party aggrieved by the judgment may appeal, and [the defendants were] 100% successful.") (internal quotation marks omitted).

precise facts to which it is to be applied," and that the nature of judicial review constrains a federal court to consider only the case that is actually before it. *McConnell*, 540 U.S. at 192 (citing *United States v. Raines*, 362 U.S. 17, 21 (1960) and *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 547 (1991) (Blackmun, J., concurring)); *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 477-78 (1995) ("[A]lthough the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants.") (internal citations omitted); *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (holding that a ruling of facial invalidity "is, manifestly, strong medicine" and noting that "[i]t has been employed by the Court sparingly and only as a last resort").

CRLC's facial validity argument is succinct: "because the application of political committee status to groups lacking the requisite major purpose is self-evidently 'substantial,' . . . the provision ought to be declared unconstitutional on its face as well." Aple's Br. at 46. We agree with CRLC that the application of § 2(12)(a) to it creates an impermissible risk of the suppression of ideas because it omits the "major purpose" test and encompasses groups whose "incidental purpose" may be to engage in express advocacy. *Bartlett*, 168 F.3d at 712-13. However, without more, we cannot say that in *every* application § 2(12) will be unconstitutional and we decline to formulate a rule of constitutional law broader

39

than is required.  *McConnell*, 540 U.S. at 192.  Therefore, we decline to reach CRLC's facial invalidity challenge.

## III. CONCLUSION

This case demonstrates the exacting scrutiny a campaign reform act will undergo when it regulates an organization's expenditures.  Here, because CRLC is an *MCFL*-exempt entity, §§ 3(4)(a) and (6)(2) of Article XXVIII are unconstitutional as applied to it.  Section 2(12)(a) is also unconstitutional as applied to CRLC because it does not contain *Buckley*'s "major purpose" test.

Accordingly, we AFFIRM the district court's thorough and well-reasoned order to the extent that it granted summary judgment in part and afforded injunctive relief to CRLC, and we DISMISS the remainder of CRLC's cross-appeal.