FILED
United States Court of Appeals
Tenth Circuit

June 30, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NEW MEXICO YOUTH ORGANIZED,
a project of the CENTER FOR CIVIC
POLICY, and SOUTHWEST
ORGANIZING PROJECT,

      Plaintiffs-Appellees,

  v.

MARY HERRERA, in her capacity as
Secretary of State,

      Defendant-Appellant,

JAMES MADISON CENTER FOR FREE
SPEECH,

      Amicus Curiae.

No. 09-2212

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(1:08-CV-01156-JCH-WDS)**

Scott Fuqua, Assistant Attorney General (with Gary King, Attorney General of New
Mexico, on the briefs), Santa Fe, New Mexico, for Appellant.

Sara Berger, Freedman Boyd Hollander Goldberg Ives & Duncan, P.A., (with John W.
Boyd and David H. Urias on the brief), Albuquerque, New Mexico, for Appellees.

James Bopp, Jr. and Randy Elf, James Madison Center for Free Speech, Terre Haute, IN,
filed an amicus curiae brief on behalf of the James Madison Center for Free Speech on
Behalf of Appellees.

Before **BRISCOE**, Chief Judge, **HOLLOWAY** and **HENRY**, Circuit Judges.

**HENRY**, Circuit Judge.

Mary Herrera, the Secretary of State of New Mexico, appeals the district court's grant of summary judgment in favor of the appellees, New Mexico Youth Organized and Southwest Organizing Project. The district court ruled that Secretary Herrera's attempt to regulate these two organizations was unconstitutional. In assessing the constitutionality of the attempted regulation we apply principles from *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), and its progeny, especially *Colorado Right to Life Committee, Inc. v. Coffman* ("CRLC"), 498 F.3d 1137 (10th Cir. 2007). Because we agree with the district court that the Secretary of State cannot constitutionally regulate the organizations, we affirm the district court's grant of summary judgment.

## I.    FACTUAL BACKGROUND

### A.  New Mexico Youth Organized and Southwest Organizing Project

The New Mexico Youth Organized ("NMYO") is a statewide project run by the Center for Civic Policy ("CCP"), a 501(c)(3) nonprofit corporation that pays NMYO's operating costs and hires NMYO's staff. *See* 26 U.S.C. § 501(c)(3). According to the CCP's Executive Director, Eli Il Yong Lee, "NMYO was formed for the purpose of educating young New Mexicans about issues such as healthcare, clean elections, the economy and the environment." Aplt's App. at 97. Further, "NMYO educates the public about how their governmental representatives vote and how these representatives are

2

funded. NMYO encourages its constituents to communicate with their representatives regarding issues important to New Mexico youth." *Id.* at 98. According to Mr. Lee, NMYO "do[es] not engage in express advocacy for the election or defeat of candidates for public office." *Id.* at 97.

Southwest Organizing Project ("SWOP") is a nonpartisan project of Southwest Community Resources, Inc., a 501(c)(3) nonprofit corporation that serves as SWOP's sponsor for Internal Revenue Service reporting purposes. According to its Executive Director, "SWOP was formed for the purpose of empowering and educating the public about issues such as environmental health and justice, economic development, community development, public education, arts and culture, housing, workers' rights, racial justice and gender equality," and it "engages in educational activities, nonpartisan get out the vote . . . activities, training and leadership development, and community development." Aplt's App. at 99. The group also "educates the public about how their governmental representatives vote and . . . are funded. . . . [and] encourages its constituents to communicate with their representatives regarding issues important to them." *Id.* at 100. According to its representative, SWOP "does not engage in express advocacy for the election or defeat of candidates for public office." *Id.*

## B. Mailers

In March and April 2008, NMYO and SWOP mailed advertisements criticizing several incumbent state legislators. The mailings denounced certain initiatives the legislators proposed during the legislative session, pointed out that the sponsoring legislators had relied upon certain organizations for funding, and suggested that the

legislators were beholden to corporate interests rather than actually working for the public good. Recipients were urged to contact the legislators to express their concern about the legislators' votes and funding sources. The mailings were targeted to the legislators' constituents, and each mailing mentioned an upcoming special legislative session focused on healthcare.

A typical mailer looked like the one sent to State Senator Shannon Robinson's constituents. This mailer had a child depicted on the front with a thermometer in her mouth and stated: "With a special session of the legislature this summer to address HEALTH CARE, it's important to find out WHOSE SIDE IS SENATOR ROBINSON ON?" *Id.* at 81. On the back of the mailer, it asked: "When New Mexico's state legislature makes critical decisions on our health care, who will State Senator Shannon Robinson stand with?" *Id.* at 82. It then highlighted a bill that Senator Robinson voted against in the 2008 legislative session that "would have required insurance companies to simply disclose to consumers in clear language the reasons why their health insurance premiums are increased each year," and stated that by voting against the bill, Senator Robinson "voted with the insurance industry." *Id.* It then cited Senator Robinson's campaign finance reports and contended that, "[s]ince 2003 almost 70% of [Senator] Robinson's campaign contributions . . . have come from . . . [the] health care, pharmaceutical and insurance industry[,] lobbyists[,] banks and payday loan industry[,] liquor and tobacco industry, Political Action Committees[,] . . . [and the] oil and mining industries." *Id.* The card concluded: "With a special session of the legislature this

4

summer on health care, it's important to CALL SHANNON ROBINSON. REMIND

HIM HE WORKS FOR YOU. Call Senator Shannon Robinson at . . . ." *Id.*

NMYO sent out nine pieces of direct mail between March 22, 2008 and April 5,

2008. The organization has a $225,000 annual budget, of which $15,000 was spent on

the direct mail campaign. Aplt's App. at 35.

SWOP sent out five pieces of direct mail between March 22, 2008 and April 5,

2008; these mailers were similar to those sent by NMYO and discussed positions taken

by elected officials during the February 2008 legislative session and the sources of those

officials' campaign funding. SWOP has a $1,100,000 annual budget, of which it spent

approximately $6,000 on the direct mailing campaign. *Id.* at 36.

### C. Complaint and request to comply with the New Mexico Campaign Reporting Act

One of the targeted legislators, Senator Shannon Robinson, sent a letter of

complaint to the New Mexico Secretary of State, Mary Herrera, and made a telephonic

complaint to the New Mexico Attorney General. A second targeted legislator, Senator

Bernadette Sanchez, also contacted the Attorney General. The complaints alleged that

NMYO and SWOP failed to register as political committees under the New Mexico

Campaign Reporting Act ("NMCRA"), N.M. Stat. Ann. §§ 1-19-25 to -36 (West 1978).

The NMCRA, in relevant part, provides as follows:

> A. It is unlawful for any political committee that receives, contributes or expends in excess of five hundred ($500) in any calendar year to continue to receive or make any contribution or expenditure for a political purpose unless that political committee appoints and maintains a treasurer and registers with the secretary of state.

5

B. A political committee shall register with the secretary of state within ten days of receiving, contributing or expending in excess of five hundred dollars ($500) by paying a filing fee of fifty dollars ($50.00) and filing a statement of organization under oath on a prescribed form showing:

(1) the full name of the political committee, which shall fairly and accurately reflect the identity of the committee, including any sponsoring organization, and its address;

(2) a statement of the purpose for which the political committee was organized;

(3) the name, address and relationship of any connected or associated organization or entity;

(4) the names and addresses of the officers of the committee; and

(5) an identification of the bank used by the committee for all expenditures or contributions made or received.

N.M. Stat. Ann. § 1-19-26.1(A)-(B).

Furthermore, the NMCRA requires that

[e]ach treasurer of a political committee shall file a report of expenditures and contributions . . . until the treasurer files a report that affirms that the committee has dissolved or no longer exists and that its bank account has been closed.

*Id.* § 1-19-29(G); *see id.* § 1-19-31 (setting forth the required contents of the report).

The statute defines a "political committee" as:

two or more persons . . . who are selected, appointed, chosen, associated, organized or operated primarily for a political purpose; and "political committee" includes: (1) political action committees or similar organizations composed of employees or members of any corporation, labor organization, trade or professional association or any other similar group that raises, collects, expends or contributes money or any other thing of value for a political purpose; . . . (3) a person or an organization of two or more persons that within one calendar year expends funds in excess of five hundred dollars ($500) to conduct an advertising campaign for a political purpose.

*Id.* § 1-19-26(L).

6

The statute defines an "advertising campaign" as "an advertisement or series of advertisements used for a political purpose and disseminated to the public either in print, by radio or television broadcast or by any other electronic means, including telephonic communications, and may include direct or bulk mailings of printed materials." *Id.* § 1-19-26(A).

On April 25, 2008, Secretary of State Herrera issued a letter stating that NMYO was not required to register as a political committee under the NMCRA. On May 22, 2008, Albert J. Lama, Chief Deputy Attorney General, wrote to Secretary Herrera, requesting that she amend her April 25, 2008 letter to reflect that the NMYO does fall under the NMCRA. Aplt's App. at 18–19.

On August 18, 2008, Secretary Herrera sent a letter to NMYO stating that "it appears that [NMYO] is operating as a political committee for purposes of the [NMCRA]" and thus must register and file reports with the Secretary of State's office. *Id.* at 20. The letter also stated that NMYO had ten business days to correct the matter, and that failure to comply with the NMCRA would subject the organization to mandatory penalties as prescribed under NMCRA. On August 28, 2008, Secretary Herrera sent a similar letter to SWOP stating that it was "operating as a political committee for purposes of the [NMCRA]" and demanding that it register as a political committee or face penalties. *Id.* at 21.

In response, on December 16, 2008, NMYO and SWOP filed a complaint for declaratory and injunctive relief. The complaint challenged various provisions of the

7

NMCRA, both facially and as applied to them, and sought a preliminary injunction, ordering Secretary Herrera to halt enforcement of the NMCRA as it applies to them.

## D. District Court's grant of summary judgment

After concluding that NMYO and SWOP had standing to challenge the NMCRA, the district court provided an overview of the law regulating expenditures by organizations.[1] The court reviewed the two categories of speech that could be regulated, as delineated from *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), and its progeny. These cases state that for a mailing such as this to be a regulable campaign related communication the speech must be unambiguously campaign related. Aplt's App. at 180. To count as unambiguously campaign related, the speech must qualify as either: (1) express advocacy or its functional equivalent or (2) have originated from a political committee.

The district court then began by addressing the question of whether the mailings in question qualify in the former of the two categories. Secretary Herrera argued that because the mailings were sent for a political purpose, to influence or attempt to influence an election, they may be regulated. The district court first noted that, given well-established Supreme Court precedent, the NMCRA's definition of "political purpose," *see* N.M. Stat. 1-19-26(M) ("'[P]olitical purpose' means influencing or

---

[1] The district court also rejected the argument that the federal courts were not the proper forum "because the [NMCRA] sets forth an administrative procedure under which a party may ask the Secretary of State to change her decision and, if that fails, may submit to binding arbitration to determine if an assessed penalty will be upheld." Aplt's App. at 178. The court held that the administrative procedures delineated in the NMCRA are not exclusive and do not preclude parties from seeking judicial relief for alleged violations of constitutional rights. *Id.* at 179.

attempting to influence an election or pre-primary convention, including a constitutional amendment or other question submitted to the voters[.]"), was overbroad and vague. *Id.* The court found that the definition in the NMCRA mirrored the Federal Election Campaign Act definition, which the Supreme Court held unconstitutional in *Buckley*, 424 U.S. at 78–79. Thus, the court stated that in order to be constitutional, the phrase "political purpose" may be applied only to reach contributions or expenditures for communications that constitute express advocacy for the election or defeat of a clearly identified candidate, or its functional equivalent. Aplt's App. at 180 (citing *FEC v. Wisc. Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449 (2007)).

The district court held that the communications by the NMYO and SWOP do not satisfy this narrow definition of political purpose. The court first established that the speech was not express advocacy. Next, the court found that such ads did not constitute the functional equivalent of express advocacy. The court pointed to the following facts: (1) the communications did not mention any future primary or general election in which the targeted legislators would be running; (2) the ads highlighted the legislators' voting records; and (3) the ads warned that corporate interests were likely to try to influence the legislators' positions on health care legislation and urged recipients to contact their legislators so that their voices could be heard. Thus, the court stated the "ads are susceptible of a reasonable interpretation other than as an appeal to vote for or against a specific candidate." Aplt's App. at 181 (quoting *WRTL*, 551 U.S. at 474 n.7).

This conclusion was also buttressed by the fact that the ads were not mailed within 30 days of a primary election or 60 days of a general election. The court held that the

9

fact that the communications were made "well outside of this period further informs the [c]ourts's findings that the ads were not regulable 'electioneering communications.'" *Id.* at 183.[2]

Finally, the court addressed the question of whether NMYO and SWOP can be properly classified as "political committees," such that all of their speech may be properly subject to regulation. NMCRA defines a political committee as an organization operated primarily for a political purpose. The NMCRA also states that any organization that spends over $500 in one year on a political ad campaign constitutes such a political committee. Applying *Buckley*'s major purpose test, the district court struck down the second part of the definition, stating that a spending trigger for "such insubstantial

---

[2] "Electioneering communication" was defined in 2 U.S.C. § 434(f)(3) as:
> (i) . . . any broadcast, cable, or satellite communication which--
>> (I) refers to a clearly identified candidate for Federal office;
>> (II) is made within--
>>> (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
>>> (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
>> (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.
> (ii) If clause (i) is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein, then the term "electioneering communication" means any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate.

2 U.S.C. § 434(f)(3).

expenditures is not narrowly tailored and cannot survive exacting scrutiny." *Id.* at 184.

Applying circuit precedent, from *CRLC*, 498 F.3d at 1146, the court found that

"[b]ecause NMCRA targets organizations as a whole, requiring a reporting of each

expenditure and source of each contribution received by the 'political committee,'

without regard to whether the expenditure was for an election-related expense, or whether

the contribution was made specifically for such a purpose, it differs in a material respect

from valid laws governing regulation of only election-related transactions." Aplt's App.

at 185. Thus, the district court granted summary judgment for NMYO and SWOP. The

district court also dismissed as moot the plaintiffs' motion for a preliminary injunction.

## II. ANALYSIS

In arguing that the organizations may be regulated under *Buckley* and its progeny,

Secretary Herrera challenges the district court's grant of summary judgment on the basis

that: (1) the mailers should be classified as the functional equivalent of express

advocacy; and (2) the finding that the groups did not constitute political committees,

under *Buckley*'s major purpose test, is erroneous.[3]

"We review the district court's grant of summary judgment de novo, applying the

same legal standard used by the district court." *Somoza v. Univ. of Denver*, 513 F.3d

1206, 1211 (10th Cir. 2008). Summary judgment is appropriate "if the pleadings, the

---

[3] In addition, Secretary Herrera requested this court to overturn the decision from *Colorado Right to Life*, arguing that decision was "too broadly decided." Aplt's Br. at 5. The principle of stare decisis, however, binds this court to that ruling. *United States v. Meyers,* 200 F.3d 715, 720 (10th Cir. 2000) ("We are bound by the precedent of prior panels absent *en banc* reconsideration or a superseding contrary decision by the Supreme Court." (quotation marks omitted)).

11

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we examine the factual record in the light most favorable to the party opposing summary judgment." *Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir. 1997). Particularly because "this decision implicates First Amendment freedoms, we perform an independent examination of the whole record in order to ensure that the judgment protects the rights of free expression." *CRLC*, 498 F.3d at 1146 (quoting *Faustin v. City & County of Denver*, 423 F.3d 1192, 1195–96 (10th Cir. 2005)).

The regulations at issue here require disclosure, thus distinguishing them from regulations that limit the amount of speech a group may undertake. *See Buckley*, 424 U.S. at 64 ("Unlike the overall limitations on contributions and expenditures, the disclosure requirements impose no ceiling on campaign-related activities."). As such, the regulations must pass "exacting scrutiny." *Id.* ("We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. . . . [w]e have required that the subordinating interests of the State must survive exacting scrutiny."); *Doe v. Reed*, No. 09-559, 2010 WL 2518466, at *7 (June 24, 2010). "That standard requires a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the

12

actual burden on First Amendment rights." *Doe*, 2010 WL 2518466, at *7 (internal

quotation and citation omitted).

In *Buckley*, the Court held that the reporting and disclosure requirements then

imposed by the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. § 431 *et

seq.* ("FECA"), survived "exacting scrutiny" so long as they were construed to reach only

that speech which is "unambiguously campaigned related."[4] See 424 U.S. at 79-81. There

are two categories of speech which qualify as unambiguously campaign related according

to *Buckley* and its progeny. First, speech that expressly advocates or is the functional

equivalent of express advocacy for the election or defeat of a specific candidate is

unambiguously related to the campaign of a candidate and thus properly subject to

regulation regardless of its origination. *WRTL*, 551 U.S. at 476. Second, all expenditures

by political committees qualify as unambiguously campaign related and accordingly,

political committees may be properly subject to extensive reporting and disclosure

requirements. *Buckley*, 424 U.S. at 79 ("Expenditures of candidates and of 'political

committees' so construed can be assumed to fall within the core area sought to be

addressed by Congress. They are, by definition, campaign related."). As the New

Mexico statute does not regulate individual communications, the issue before this court is

solely whether NMYO and SWOP may be classified as political committees for the

---

[4] During oral argument, Secretary Herrera argued that the Supreme Court in its recent decision in *Citizens United v. FEC*, 558 U.S. ---, 130 S. Ct. 876 (2010), abandoned this "unambiguously campaign related" standard. Although that opinion left many issues unresolved, we believe that requirement—that for a regulation of campaign related speech to be constitutional it must be unambiguously campaign related standard—as it pertains to this case has not been changed.

purpose of requiring that they register with the New Mexico Secretary of State and file periodic disclosure statements.

In *Buckley*, the Court held a political committee may "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79. Given that Secretary Herrera concedes that the organizations here were not under the control of a political candidate, if NMYO and SWOP are to be deemed political committees it must be under "the major purpose" test. *Id.*; *see FEC v. Akins*, 524 U.S. 11, 29 (1998).

NMCRA regulates speech by organizations "operated primarily" for a political purpose. N.M. Stat. Ann. § 1-19-26(L). The NMCRA also states that a $500 a year expenditure for political purposes is sufficient to establish that the organization's major purpose is political and thus to trigger the requirement that the organization register as a political committee. *Id.* Thus, we consider whether the organizations can be constitutionally said to have a primary purpose of influencing elections—as measured by either a comprehensive examination of its activities or by its satisfaction of the $500 threshold—such that it can be subject to the full range of disclosure and report provisions.[5]

---

[5] The organizations' claims can best be construed as an "as applied" challenge. The "as applied" challenge acknowledges that the law may have some potential constitutionally permissible applications, but argues that the law is not constitutional as applied to these organizations. By contrast, a statute may be facially invalid based on overbreadth. "[Overbreadth is a] type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional." *Wash. State Grange v. Wash. State*

The NMCRA requires that organizations "operated primarily" for the purpose of "influencing or attempting to influence an election" must register with the Secretary of State as "political committees," pay a filing fee, and file reports disclosing their activities and contributors. N.M. Stat. Ann. §§ 1-19-26(L), (M), 1-19-26.1(B), 1-19-29(G). To be regulated under the standards established by the Supreme Court, the "operated primarily" language would need to satisfy the "major purpose" test, because this test sets the lower bounds for when regulation as a political committee is constitutionally permissible. *See N.C. Right to Life v. Leake (NCRTL)*, 525 F.3d 274, 288, 289 (4th Cir. 2008) ("[R]egulation as a political committee is only proper if an organization primarily engages in election-related speech" because an alternate rule would "threaten[] the regulation of too much ordinary political speech to be constitutional."). Thus, we analyze whether the organizations meet the major purpose requirements.

---

*Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted). The ultimate question in a facial challenge is whether the law is unconstitutional in most of its applications, or, in overbreadth terms, whether the law chills a substantial amount of protected speech. *See generally United States v. Williams*, 553 U.S. 285, 292-93 (2008). Facial challenges have been described as "strong medicine" and not generally favored by the courts. *Los Angeles Police Dep't. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)); *see Wash. State Grange*, 552 U.S. at 449 n.6 ("[Courts] generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." (internal quotation marks omitted)).

Here, neither side has briefed whether this provision is facially unconstitutional. Thus, we do not address the question. Similarly, in *CRLC*, the court decided not to address the facial challenge, finding that the "as applied" challenge adequately addressed the group's concerns and that it was not necessary to formulate a broader rule. *CRLC*, 498 F.3d at 1156 ("[W]ithout more, we cannot say that in *every* application [the statute] will be unconstitutional and we decline to formulate a rule of constitutional law broader than is required.").

There are two methods to determine an organization's "major purpose": (1) examination of the organization's central organizational purpose; or (2) comparison of the organization's electioneering spending with overall spending to determine whether the preponderance of expenditures is for express advocacy or contributions to candidates. *CRTL*, 498 F.3d at 1152.

Under either approach of the major purpose test, the organizations here do not qualify as political committees. First, looking to the central purposes of the organizations, neither qualifies as a political committee. "Neither NMYO nor CCP has ever advocated for the election or defeat of any candidate for office." Aplt's App. at 98. NMYO' s express goal is to educate young New Mexicans regarding issues of importance to them. NMYO also engages in research, leadership development, and nonpartisan get-out-the-vote activities. Similarly, "SWOP has never advocated for the election or defeat of any candidate for office." *Id.* at 100. SWOP's primary purpose is to empower the New Mexico communities, including Latino and other people of color, low-income individuals, and young people to realize racial and gender equality and social and economic justice. SWOP also engages in other educational activities, nonpartisan get-out-the-vote activities, training and leadership development, and community development. Thus, neither has a central organizational purpose that is campaign or election related.

Second, there is no indication that either group spends a preponderance of its expenditures on express advocacy or contributions to candidates. Indeed, there is no evidence in the record to contradict the declarations from the parties that they do not

16

engage in advocacy for candidates or make contributions to them, nor to establish that election related expenses make up a preponderance of the organizations' expenditures.

Thus, even to the extent that Secretary Herrera attempts to classify either NMYO or SWOP as a "political committee," based upon the fact that it spends at least $500 a year for political purposes, *see* N.M. Stat. 1-19-26(L), such a classification is constitutionally infirm.

In similar circumstances, this court, in *CRLC*, held that a $200 trigger, standing alone, is incompatible with a "major purpose" test. *CRLC*, 498 F.3d at 1153. In *CRLC*, the court considered the constitutionality of a provision that defined a political committee as any group that spends more than $200 in a year to support or oppose the nomination or election of one or more candidates and subjected such groups to various administrative, organizational, and reporting requirements. The court there held that the $200 trigger was unconstitutional as applied to the Colorado Right to Life Committee because it was an unacceptable proxy for the major purpose test: "[T]he amount of money an organization must accept or spend—$200—is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets." *Id.* (alteration in original) (quoting *Colo. Right to Life Comm., Inc. v. Davidson*, 395 F. Supp. 2d 1001, 1021 (D. Colo. 2005)). For example, the court pointed out that, under the Colorado statute, "an entity that spends $200,000 on various non-political activities and donates $200 (1/10 of 1% of its budget) to a candidate is deemed a political committee." *Id.* (quoting *Colo. Right to*

17

*Life Comm., Inc.*, 395 F. Supp. 2d at 1021).  Thus, the court in *CRLC* held that a $200

trigger could not serve as a proxy for the major purpose test, reasoning that for some

groups—for example ones with budgets of $200,000—a $200 expenditure is a trivial

amount.

Similarly, here, an organization that spends $500 on an election-related expense is

automatically subject to the reporting requirements and other limitations imposed on a

political committee, regardless of what percentage of operating funds that $500

constitutes or what else the organization spends its resources on.  To automatically

classify such organizations as political committees contradicts the Supreme Court's

repeated admonition that only organizations that have "the major purpose" of electing or

defeating a candidate may be forced to register as political organizations.  As the district

court noted:

> NMYO's yearly budget is approximately $225,000.  SWOP's yearly budget is approximately $1,100,000.  Thus, under NMCRA, these organizations would be classified as "political committees" if they spent as little as 2/10 of one percent and 5/100 of one percent of their budgets, respectively, on electioneering communications.  Taking it out of the realm of the hypothetical, in this case, NMYO spent approximately $15,000 on the mailings, which amounts to less than seven percent of its budget, and SWOP spent approximately $6,000 on the mailings, which amounts to just over 1/2 of one percent of its budget.  Such proportionally small expenditures, standing alone, cannot justify characterizing an organization's "major purpose" as electioneering.

Aplt's App. at 184.  NMYO and SWOP are correct in their assertion that:  "the New

Mexico statute in question is not different in any meaningful way from the Colorado

constitutional amendment that this [c]ourt held was unconstitutional as applied because it

defined an organization's 'major purpose' by reference to a small dollar amount of

18

expenditures rather than by reference to the actual activities of the organization." Aples' Br. at 21. Thus, we hold that the attempt to regulate NMYO and SWOP as political committees is unconstitutional as applied.

## III. CONCLUSION

For the foregoing reasons we AFFIRM the district court's grant of summary judgment in favor of NMYO and SWOP.